**_*NOT FOR PUBLICATION*_**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PETER KLAPPER,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>RICHARD G. "CHAD" SULLIVAN and METUS CAPITAL GROUP, LLC,<br><br>　　　　　Defendants. | Civil Action No. 17-13137 (FLW)<br><br>**OPINION** |
| RICHARD SULLIVAN and METUS CAPITAL GROUP, LLC,<br><br>　　　　　Counterclaim-Plaintiffs,<br><br>v.<br><br>PETER KLAPPER,<br><br>　　　　　Counterclaim-Defendant. | |

**WOLFSON, Chief Judge:**

Plaintiff Peter Klapper ("Plaintiff" or "Klapper") brought this contract-related action against Defendants Richard G. Sullivan ("Sullivan") and Metus Capital Group, LLC ("Metus Capital") (collectively, "Defendants"). Presently before the Court is a Motion by Plaintiff to dismiss Defendants' Amended Counterclaims, which arise out of two business arrangements between Plaintiff and Defendants: (1) an Investment Management Agreement ("IMA") entered into between Metus Capital and Klapper in 2007, pursuant to which Metus Capital served as investment manager for certain of Klapper's assets, and (2) the 2014 investment in a real estate project through an entity, Thomas Paine House, LLC ("TPH"). Specifically, Plaintiff contends

that with respect to Metus Capital's claims arising from the IMA, those counterclaims are barred by the applicable statute of limitations, the statute of frauds, and fail to state a claim upon which relief can be granted.  As for Defendants' remaining counterclaims, Plaintiff submits that those claims should be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

For the reasons that follow, Plaintiff's Motion to Dismiss is **GRANTED** in part and **DENIED** in part.  With respect to Metus Capital's counterclaims in connection with the IMA, Plaintiff's motion is denied as to Metus Capital's breach of contract claim (Count I), but granted as to the breach of the implied covenant of good faith and fair dealing (Count II) and conversion (Count III) claims, because those claims are duplicative of Count I.

As for Defendants' counterclaims for breach of the parties' Standstill and Tolling Agreement (Count IV) and breach of the implied covenant of good faith and fair dealing related to the Standstill and Tolling Agreement (Count V), Plaintiff's motion is granted with respect to Metus Capital based on Metus Capital's failure to adequately allege damages, but denied as to Sullivan.

Finally, as it relates to Sullivan's counterclaims asserted in Counts VI, VII, VIII and IX, Plaintiff's motion is denied as to Sullivan's claim for breach of the TPH Operating Agreement (Count VI), but Plaintiff's motion is granted with respect to Sullivan's claim for breach of the implied covenant of good faith and fair dealing in connection with TPH's Operating Agreement (Count VII), because that claim is duplicative of Count VI.  Counts IX and X are also dismissed to the extent they attempt to assert claims derivatively on behalf of TPH, an entity which has not formally intervened in this case.  In sum, Counts II, III, V, VII, IX, and X are dismissed in their entirety.

I.   **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The following factual allegations are taken from Defendants' Answer and Amended Counterclaims and are accepted as true for the purpose of this Motion.  (ECF No. 46, Defendants' Answer and Amended Counterclaims ("Answer").)

A.   Investment Management Agreement

In or around 2007, Sullivan formed Metus, "a limited liability company organized and existing under the laws of the State of Florida," with "its principal place of business in St. Petersburg, Florida," allegedly for the sole purpose of managing Klapper's portfolio of investments.  (Answer, at ¶¶ 13, 24, 26.)  Sullivan is the sole member and manager of Metus.  (*Id.* at ¶¶ 13.)

On September 6, 2007, Klapper and Metus entered into the IMA, pursuant to which "Metus [] was to provide Klapper with investment advisory services, and Klapper was to compensate Metus [] for those services." (*Id.* at ¶¶ 28-29.)  Specifically, "Metus' [] compensation was two-tiered": Metus would receive "an annual management fee equal to 2% of the assets under management" and an "annual performance fee equal to 20% of the amount that the assets under management outperformed the S&P 500 for the calendar year." (*Id.* at ¶ 30.)  Pursuant to the IMA, "[t]he performance based fee was payable on January 15 of the following year" and the annual management fee was due on a quarterly basis.  (*Id.*)

Metus purportedly calculated the total fees due to Metus for 2008 under the IMA as $173,200, consisting of a performance fee of $73,440 and a management fee of $99,760 (together, the "2008 Fees").  (*Id.* at ¶ 34.)  However, in a letter dated February 3, 2009, Sullivan, on behalf of Metus Capital, allegedly offered to forego collection of the 2008 Fees, if Klapper elected to keep those funds in his account for ten years, so that they would be reinvested in the same manner that Klapper's initial funds were invested.  (*Id.* at ¶ 35.)  At the conclusion of those ten years, in

February 2019, Sullivan proposed that the 2008 Fees would be due to Metus Capital, plus any appreciation resulting from Metus Capital's investment management.  (*Id.*)   According to Defendants, Sullivan and Klapper had discussions related to Sullivan's proposed deferral of payment of the 2008 Fees.  (*Id.* at ¶ 36.)  In September 2010, Sullivan and Klapper allegedly agreed, in writing, that the 2008 Fees and appreciation thereon would become due in February 2019, and that the proceeds would be invested in an entity, controlled and owned by Sullivan, which would purchase property in the south of France (the "September 2010 Letter Agreement"). (*Id.* at ¶ 37.)  To the extent the property generated rental profits, the agreement allegedly contemplated that they would be split equally between Sullivan and Klapper.  (*Id.*)

According to Defendants, over the next ten years, Metus Capital managed Klapper's investments, allegedly making millions of dollars through its investment management strategies. (*Id.* at ¶ 39.)  However, in 2016, Klapper allegedly terminated Metus Capital as his investment manager—a decision that Defendants claim was motivated by Klapper's desire to avoid paying the 2008 Fees.  (*Id.* at ¶¶ 5, 47.)  Regardless of the motivation, Defendants allege that Klapper has not paid the 2008 Fees pursuant to the parties' purported agreement and has instead converted them for his own use.  (*Id.* at ¶¶ 32, 38.)

B.    Thomas Paine House, LLC

Aside from the 2008 Fees, in late 2014, Metus Capital also allegedly made a $1,000,000 investment on Klapper's behalf in TPH, which owned and operated a property located at 170 Ocean Boulevard, Atlantic Highlands, New Jersey 07716 (the "Property").   (*Id.* at ¶ 6.) Specifically, Defendants allege that in or around 2009, Sullivan and a business partner purchased the Property with a plan to construct the Thomas Paine House.  (*Id.* at ¶ 40.)  At that same time, Sullivan and his business partner formed Point Lookout Partners, LLC ("PLP"), and the Property

was conveyed to PLP in 2010.  (*Id.*)  In 2014, Sullivan formed TPH, and using Klapper's investment, Sullivan purchased the Property and granted PLP a mortgage.  (*Id.* at ¶ 41.)  According to Defendants, Sullivan and Klapper were the only two members of TPH, with Klapper owning 78% and Sullivan owning 22% of the company.  (*Id.* at ¶ 45.)  Sullivan allegedly managed TPH and the Property, including the rebuild of a pre-existing Revolutionary War-era home that came to be known as the Thomas Paine House, while Klapper was a passive investor.  (*Id.*)

By approximately April 2016, however, TPH was unable to make its mortgage payment to PLP.  (*Id.* ¶ 46.)  As a result, Defendants allege that Sullivan proposed to Klapper that in exchange for Klapper making 78% of the mortgage payments on the Property going forward, in accordance with his ownership interest in TPH, that Sullivan would absolve Klapper of his obligation to pay the 2008 Fees.  (*Id.* at ¶ 48.)  Klapper purportedly refused this arrangement and did not pay either the 2008 Fees or the mortgage payments.  (*Id.*)

C.   The Standstill Agreement

In August 2016, PLP commenced foreclosure proceedings on the Property, and Klapper filed a separate lawsuit ("State Court Action") against Defendants seeking money damages and injunctive relief based on alleged fraudulent conduct committed by Defendants in connection with the TPH investment.  (*Id.* at ¶ 49.)

Thereafter, on May 31, 2017, Klapper allegedly entered into a Standstill, Tolling and Transition Agreement (the "Standstill Agreement") with Sullivan and Metus Capital.  (*Id.* at ¶ 50.)  Pursuant to the Standstill Agreement, Klapper purportedly agreed to dismiss the State Court Action against Sullivan without prejudice and Klapper also agreed to "[take] over the management and operational control of TPH and the Property."  (*Id.*)  Specifically, Defendants allege that the Standstill Agreement provided that Klapper was to "use commercially reasonable efforts to sell

the Property on behalf of TPH" during the "Standstill Period." (*Id.* at ¶ 51.) The Standstill Period was defined as the period from May 31, 2017, through the earliest of (i) August 15, 2017, (ii) the date of entry of a final judgment in the PLP foreclosure action, (iii) the sale of the Property by TPH, or (iv) termination of the Standstill Agreement by Klapper. (*Id.*)[1] In addition, Defendants also claim that the Standstill Agreement provided that if the Property was sold for an amount exceeding the mortgages, taxes, and liens on the Property, and other liabilities of TPH, "the excess funds would be distributed to Klapper alone, and Sullivan 'shall receive a set-off of 175% of the sum distributed to Klapper against the damages awarded, if any,' in the lawsuit Klapper filed against Sullivan." (*Id.* at ¶ 53.)

According to Defendants, Klapper, who lived in California at the time, made no effort to sell the Property during the Standstill Period, and he also failed to maintain the Property. (*Id.* at ¶ 54.) Indeed, Defendants allege that Klapper "allowed it to languish and fall into disrepair, which resulted in a significant mold problem that went untreated and drove the value of the Property down and decreased its marketability." (*Id.* at ¶ 55.) Defendants allege that as a result of "Klapper's dereliction of his duties," the Property was foreclosed upon and sold to PLP at a sheriff's sale in October 2017, at the price of $1,000. (*Id.* at ¶ 56.)

D.   The Operating Agreement

Also on May 31, 2017, Defendants claim that Sullivan and Klapper executed an Operating Agreement in connection with TPH ("Operating Agreement"). (*Id.* at ¶ 57.) While confirming that Klapper and Sullivan were the sole members of TPH, with respective interests in the company of 78% and 22%, the Operating Agreement also purportedly entitles Sullivan to 22% of distributions

---

[1]   Despite a final judgment being entered in the foreclosure action on July 27, 2017, the parties agreed on August 15, 2017, to extend the Standstill Period to October 14, 2017. (*Id.* at ¶ 52.)

made by TPH after the first $1 million of distributions.   (*Id.* at ¶ 57, 62; Operating Agreement,

Ex. E to the Declaration of John Maloney, Esq. in Support of Plaintiff's Motion to Dismiss

("Maloney Decl."), at § 4.2.)[2]

Defendants further allege that the Operating Agreement provides that Klapper, as the

manager of TPH, had the power to (i) enter into contracts, (ii) purchase insurance, (iii) execute

documents necessary to carry out the Operating Agreement, and (iv) make expenditures necessary

or appropriate in connection with the management agreement.  (*Id.* at ¶ 59; Operating Agreement,

Ex. E to Maloney Decl. at § 2.1.)  With respect to dissolution, Defendants allege that the Operating

Agreement provides that TPH could only be dissolved under the following circumstances:

> The Company shall dissolve, and its affairs shall be wound up, upon
> the first to occur of the following: (a) the written consent of the
> Members, (b) the death, retirement, withdrawal, incapacity,
> bankruptcy or dissolution of the Members or the occurrence of any
> other event which terminates the continued membership of the
> Members in the Company, or (c) the entry of a decree of judicial
> dissolution.

(*Id.* at ¶ 60.)

---

[2]      "Generally, a court considering a motion to dismiss under Rule 12(b)(6) may consider only
the allegations contained in the pleading to determine its sufficiency." *Santomenno ex rel. John
Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 290 (3d Cir. 2014), *cert.
denied*, 575 U.S. 963 (2015).  However, a court may also consider the following without converting
the motion to dismiss into one for summary judgment: (1) "documents which are attached to or
submitted with the complaint," (2) "documents whose contents are alleged in the complaint and
whose authenticity no party questions, but which are not physically attached to the pleading," and
(3) "[d]ocuments that the defendant attaches to the motion to dismiss ... if they are referred to in
the plaintiff's complaint and are central to the claim." *Id.* at 290-91 (citations and internal quotation
marks omitted); *see also Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004); *In
re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  Here, the I will
consider the documents attached by Defendants to their Answer and Amended Counterclaims,
documents attached to Plaintiff's Complaint, the September 2010 Letter Agreement and the
parties' prior emails and correspondence related to the 2008 Fees, the Standstill Agreement, the
Operating Agreement, because they are central to the claims and their contents are repeatedly
referred to in both Plaintiff's Complaint and Defendants' Answer and Amended Counterclaims.

On February 16, 2018, approximately nine months after the parties executed the Standstill Agreement and the Operating Agreement, Sullivan claims that he emailed Klapper's counsel to request Plaintiff's Form K-1s for his interest in TPH for 2016 and 2017. (*Id.* at ¶ 74.) According to Defendants, neither Klapper nor his attorney provided the documents until March 2020, at which time Sullivan was unable to claim any of TPH's losses on his own personal tax for the years 2016 through 2018. (*Id.* at ¶ 75.)

On July 31, 2019, however, Defendants allege that Klapper filed a Certificate of Dissolution[3] on behalf of TPH without Sullivan's knowledge or consent to dissolve TPH and without the occurrence of any of the other events expressed in Section 5.1 of the Operating Agreement. (*Id.* at ¶¶ 60, 68.) According to Defendants, Klapper's dissolution decision was in response to a filing by Sullivan in January 2019, in connection with the instant lawsuit, where Sullivan indicated that he had potential breach of contract and breach of fiduciary duty counterclaims to assert against Klapper. (*Id.* at ¶ 69.)

E.   Relevant Procedural History

On December 15, 2017, Plaintiff filed a Complaint against Defendants asserting claims of fraud (Count I), violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq. (Count II), unjust enrichment (Count III), conversion (Count IV), breach of fiduciary duty (Count V), breach of contract (Count VI), interference with prospective economic advantage (Count VII), constructive trust (Count VIII), and accounting (Count IX). (ECF No. 1, Plaintiff's Complaint ("Compl.").)

---

[3]   On July 16, 2019, TPH changed its name to "La Casa de Tómas Paine, LLC." (Answer, ¶ 66.)

On May 14, 2020, Defendants filed their Answer, Affirmative Defenses, and Counterclaims, and on June 18, 2020, Plaintiff filed a motion to dismiss the Counterclaims in their entirety. Rather than oppose Plaintiff's motion to dismiss, Defendants filed an Answer and Amended Counterclaims on July 20, 2020. Defendant asserts ten counterclaims: breach of contract related to the parties' purported agreement to pay 2008 fees (Count I), breach of the implied covenant of good faith and fair dealing related to the agreement to pay 2008 fees (Count II), conversion (Count III), breach of the Standstill Agreement (Count IV), breach of the implied covenant of good faith and fair dealing related to the Standstill Agreement (Count V), breach of the Operating Agreement (Count VI), breach of the covenant of good faith and fair dealing related to the Operating Agreement (Count VII), nullification of the dissolution and termination of TPH (Count VIII), breach of fiduciary duty (Count IX), and breach of the Standstill Agreement on behalf of TBH as a third-party beneficiary (Count X).

On August 14, 2020, Plaintiff moved to dismiss Defendants' counterclaims for failure to state a claim pursuant to Rule 12(b)(6). (ECF No. 50, Plaintiff's Motion to Dismiss Amended Counterclaims ("Motion to Dismiss").)

## II.   <u>LEGAL STANDARD</u>

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted). While Fed. R. Civ. P. 8(a)(2) does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  Thus, to survive a Rule 12(b)(6) motion to dismiss, the Complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a plaintiff has met the facial plausibility standard mandated by *Twombly* and *Iqbal*, courts within this Circuit engage in a three-step progression.  *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "outline the elements a plaintiff must plead to state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the Court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of trust.  *Id.*  Finally, where "there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## III.   **DISCUSSION**

Plaintiff moves to dismiss Defendants' Amended Counterclaims on numerous grounds.  As to Metus Capital's counterclaims in connection with the 2008 Fees, specifically Counts I, II, and III, Plaintiff argues that these counterclaims should be dismissed because (1) each of these causes of action has expired under the applicable statute of limitations, (2) Count I (breach of contract) is barred by the statute of frauds, and (3) Counts II (breach of the implied covenant of good faith and fair dealing) and III (conversion) fail to state cognizable causes of action.  (Pl. Moving Br., 13-14.)  As for the counterclaims related to the Standstill Agreement (Counts IV, V, and X) and the

Operating Agreement (Counts VI, VII, VIII, IX), Plaintiff argues that these claims should be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  I will address each of Plaintiff's arguments, in turn.

### A.   Counterclaims Related to the 2008 Fees

Counts I, II, and III relate to Plaintiff's purported failure to pay the 2008 Fees.  In Count I of the Amended Counterclaims, Metus Capital alleges that Plaintiff breached the parties' agreement to defer payment of the 2008 Fees due under the IMA when he failed to pay the fees in 2019.  (*See* Answer at ¶¶ 77-83.)  Similarly, Count II alleges that Plaintiff breached the implied covenant of good faith and fair dealing in the IMA and the parties' agreement to defer the payment of the 2008 Fees by, among other things, terminating his relationship with Metus Capital in April 2016, in order to avoid paying the 2008 Fees. (*See id.* at ¶¶ 5, 47, 84-88.)  In Count III, Metus Capital alleges that Plaintiff wrongfully converted the 2008 Fees that belonged to Metus Capital. (*See id.* at ¶¶ 89-92.)

At the outset, as a matter of choice of law, Plaintiff argues that regardless of whether this Court applies the statute of limitations of New York, which he claims has the "most significant relationship" to Metus Capital's counterclaims related to the 2008 Fees and the IMA, or the statutes of limitations of Florida, California, or New Jersey (all of which he claims may also have some claim to the underlying dispute), Counts I, II, and III are time-barred and should be dismissed. Plaintiff argues that these counterclaims accrued on January 16, 2009, when Plaintiff failed to pay the 2008 Fees, and the statutes of limitations of each potentially applicable state law expired before Metus Capital asserted the claims on May 14, 2020, in its initial Answer and Counterclaims.  (Pl. Moving Br., 16-21.)  In addition, Plaintiff submits that Count I should be dismissed because it is

barred by the statute of frauds, while Counts II and III should be dismissed because they fail to state a cause of action.

### 1. *Statute of Frauds and Statute of Limitations (Count I)*[4]

To determine whether Metus Capital's claims are time barred, the Court must first examine whether the 2010 September Letter Agreement effectively modified the IMA. Indeed, without the September 2010 Letter Agreement, both parties would seemingly agree that the 2008 Fees would have been due and owing to Metus Capital in 2009, in accordance with the terms of the IMA. Therefore, without the modification of the IMA, Metus Capital's breach of contract claim would be out of time regardless of what state's statute of limitations applied.[5] However, if Metus Capital sufficiently alleges that the September 2010 Letter Agreement was an amendment or modification to the IMA, which could change the accrual date, the Court must then determine which state's statute of limitations applies.

To determine modification of the relevant agreement, I note that a choice of law analysis is not necessary because the laws of New York, California, and Florida are substantially similar to, and not in conflict with, the laws of New Jersey with respect to contract modification.[6]

---

[4]    Because the Court finds, *infra*, that Metus Capital's claims for breach of the implied covenant of good faith and fair dealing (Count II) and conversion (Count III) should be dismissed on other grounds, only the timeliness of Metus Capital's breach of contract claim is considered.

[5]    Specifically, as it relates to claims for breach of contract, California has a four-year statute of limitations for written contracts and a two-year statute of limitations for oral contracts, *Warren v. Wells Fargo & Co.*, 2017 WL 4876212, at *6 (S.D. Cal. Oct. 27, 2017), New Jersey and New York have six-year statutes of limitations, N.J.S.A 2A:14-1 and N.Y. C.P.L.R. § 213(2), and Florida has a five-year statute of limitations. Fla. Stat. § 95.11(2)(b); *see also McLean v. GMAC Mortg. Corp.*, No. 6-22795, 2008 U.S. Dist. LEXIS 36143, at *49, 2008 WL 1956285 (S.D.Fla. May 2, 2008).

[6]    While neither party compared the laws of New Jersey with the laws of New York, California, and Florida on this issue, the Court conducted its own independent analysis. *See Deutsche Asset Mgmt., Inc. v. Callaghan*, No. 01-4426, 2004 WL 758303, at *15 (S.D.N.Y. Apr. 7, 2004) (finding that the basic elements of contract formation, including offer, acceptable, and consideration, and mutual assent are required for contract modification); *Dows v. Nike, Inc.*, 846

12

*Lebegern v. Forman*, 471 F.3d 424, 428 (3d Cir. 2006) ("If there is not an actual conflict, the inquiry is over and, because New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same.").

Accordingly, the Court will apply New Jersey law to determine whether the September 2010 Letter Agreement may be construed as an amendment to the IMA. In New Jersey, "[I]n the absence of some vested derivative interest in another, a contract may be modified ... by ... the contracting parties." *DeAngelis v. Rose*, 320 N.J. Super. 263, 280 (App. Div. 1999) (third alteration in original) (quoting *County of Morris v. Fauver*, 153 N.J. 80, 95 (1998)). "A contract modification is 'a change in one or more respects which introduces new elements into the details of a contract and cancels others but leaves the general purpose and effect undisturbed.' " *Wells Reit II-80 Park Plaza, LLC v. Dir., Div. of Tax'n*, 414 N.J. Super. 453, 466 (App. Div. 2010) (quoting *Int'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co.*, 147 F.3d 636, 641 (7th Cir. 1998)). Generally, modifications to a written contract are not required to be made in writing. To the contrary, a "modification can be proved by an explicit agreement to modify, or ... by the actions and conduct of the parties, so long as the intention to modify is mutual and clear." *County of Morris*, 153 N.J. at 99. However, an agreement to modify a contract "must be based upon new or additional consideration. *Id.* at 100. The consideration need not be significant; whatever consideration the parties agree to is sufficient. *Oscar v. Simeonidis*, 352 N.J. Super. 476, 485 (App. Div. 2002).

---

So. 2d 595, 602 (Fla. Dist. Ct. App. 2003) (noting that the unilateral modification of a contract is unenforceable because "[a]ny subsequent modification requires consent and a meeting of the minds of the parties to the contract whose rights or responsibilities are sought to be affected by the modification."); *U.S. Bank Tr. v. Marques*, No. 17-05534, 2018 WL 1989444, at *3 (C.D. Cal. Feb. 20, 2018) (finding that contracts can "be subsequently modified with the assent of the parties ... provided the same elements essential to the validity of the original contract are present," including that the parties capable of contracting, the parties consent, there is a lawful object, and sufficient consideration).

Here, although Plaintiff contends that the September 2010 Letter Agreement cannot constitute a modification of the IMA, because it does not expressly reference the IMA nor include a ten-year deferral of the 2008 Fees, that is not fatal.  Plaintiff overlooks Defendants' allegations that the September 2010 Letter Agreement references and incorporates the parties' prior communications and discussions related to the deferral arrangement.   (Answer, at ¶ 37.) Specifically, Defendants allege that beginning on February 3, 2009, about seventeen months before the September 2010 Letter Agreement, Metus Capital first proposed a deferral of the 2008 Fees in a letter to Plaintiff ("February 3rd Letter").  (*Id.* at ¶ 35; *see also* February 3rd Letter, Ex. C to Declaration of Michael J. Sullivan, Esq. ("Sullivan Decl.").)  Plaintiff alleges that in the February 3rd Letter, "Sullivan, on behalf of Metus Capital, offered to Klapper that he need not pay the 2008 Fees at that time, but instead could keep those funds in his account for ten years, so that they would be reinvested in the same manner that Klapper's funds were invested."  (*Id.*)  More specifically, Defendants allege that Metus Capital proposed that "at the conclusion of those ten years, in February 2019, [Defendants] would be due the 2008 Fees plus any appreciation resulting from [Defendants'] investment management."  (*Id.*)  These allegations are substantiated by the February 3rd Letter, which explained that although Plaintiff owed Metus Capital $173,200 pursuant to the IMA, Defendants offered Plaintiff to "hold on to this sum for the next ten years, and allow [Defendants'] money to compound with years."  (*See* September 2010 Letter Agreement, Ex. B to Maloney Decl.; February 3rd Letter, Ex. C to Sullivan Decl.)  As for using the compounded 2008 Fees for a potential investment property in France, the February 3rd Letter stated:

> By my estimates it certainly will be enough to buy a nice home the
> south of France.  You, of course, are always welcome to visit, we
> can work out the logistics at a later date, we have some time yet.
> But for the time being let's keep that as a goal of ours, and we can
> share different likes and dislikes of architectural styles and/or
> locations.

Defendants further allege that for the next seventeen months, Sullivan and Klapper had "multiple discussions" related to deferment of the 2008 Fees, and in September 2010, Sullivan and Klapper agreed in writing to the essential terms. (Answer, at ¶ 36.) Indeed, on June 5, 2009, Sullivan emailed Klapper to update him on his investment portfolio. (June 2009 Emails, Ex. D to Sullivan Decl.) At the conclusion of the email, Sullivan wrote, "Let's talk soon about France when you have chance," to which Plaintiff responded on June 9, 2009, "Yes, France, good, am very interested!" (*Id.*) As stated previously, the September 2010 Letter Agreement, which states, "You agree to funding the French villa investment with compounded monies from 2008 fees," explicitly incorporates and references these prior discussions and written communications with Plaintiff, these discussions, including the February 3rd Letter, the emails in June 2009, and an enclosed letter from Sullivan to Klapper dated June 12, 2009.[7] (September 2010 Letter Agreement, Ex. B to Maloney Decl.) Accordingly, it is clear, based on these prior communications, that Defendants and Plaintiff had a mutual understanding related to the deferral of the 2008 Fees.[8] It is also clear that the September 2010 Letter Agreement provided adequate consideration. Indeed, consistent with the parties' mutual understanding, Defendants agreed to forego immediate collection of the 2008 Fees, which they were entitled to under the IMA, to reinvest the money and potentially realize compounded future returns at the end of the ten-year deferral period. As for Klapper, he was able to avoid immediate payment of the 2008 Fees pursuant to the IMA.

---

[7]     Notably, the June 12, 2009 letter, from Sullivan to Klapper states, "You agree to funding the French villa investment with compounded monies from 2008 fees. We will share in any revenues derived from the rental of said property 50/50, and ownership shall be exclusive to an LLC controlled and owned by me." (*See* June 12, 2009 Letter, Ex. E to Sullivan Decl.)

[8]     To the extent that Plaintiff offers a different version of the parties' negotiations, which he does not in this Motion, that is a factual issue.

Having determined that Metus Capital sufficiently alleges that the September 2010 Letter Agreement modified the IMA, I now consider whether Count I is time barred.[9]  While it may appear, based on the Court's finding above, that a choice of law analysis is unnecessary because Metus Capital's breach of contract claim did not accrue until 2019, at which time Metus Capital alleges that Plaintiff owed it the 2008 Fees pursuant to the September 2010 Letter Agreement, questions remains, however, that neither party addresses, such as the impact of Defendants' allegations that Plaintiff terminated the underlying IMA and his relationship with Metus Capital in 2016.  The Amended Counterclaims allege that in April 2016, "Klapper terminated Metus Capital as his investment manager" in an effort to "avoid paying the 2008 Fees."  (Answer, at ¶¶ 5, 46-47.)  Despite these allegations, however, neither party discusses whether the September 2010 Letter Agreement survives Plaintiff's termination of the IMA, such that Plaintiff was still expected to pay the 2008 Fees in 2019.  Indeed, if the Court determines that the September 2010 Letter Agreement did not survive Plaintiff's termination of the IMA and his relationship with Metus Capital ended in 2016, then Metus Capital's breach of contract claim would have accrued upon termination in 2016, not 2019.  This missing information is relevant given Plaintiff's suggestion that California law, which provides a four-year statute of limitations for breach of contract claims, may potentially govern Metus Capital's claim in connection with the 2008 Fees. *Warren v. Wells Fargo & Co.*, 2017 WL 4876212, at \*6 (S.D. Cal. Oct. 27, 2017) ("If the action for breach of the covenant of good faith and fair dealing sounds in a written contact then the four-year statute of limitations governing written contracts applies.  For actions being pursued under an oral contract theory the two year statute of limitations will apply.") (internal citations omitted).

---

[9]     The Court's finding that the September 2010 Letter Agreement modified the IMA also rejects Plaintiff's argument related to the statute of frauds because the September 2010 Letter Agreement was made in writing.

That said, while this missing legal analysis is critical to future disputes, I do not find it dispositive on this Motion to Dismiss, because a limited choice of law analysis confirms that California law does not apply.  A federal court sitting in diversity applies the choice-of-law rules of the forum state—here, New Jersey—to determine the controlling law.  *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 205 (3d Cir. 2013).  New Jersey has adopted a two-part test.  The first part of the inquiry is to determine whether an actual conflict exists between the laws of the potential forums.  *Maniscalco*, 709 F.3d at 206 (citing *Lebegern v. Forman*, 471 F.3d 424, 429-30 (3d Cir. 2006)); *P.V. v. Camp Jaycee*, 197 N.J. 132 (2008).  The New Jersey Supreme Court specified the first step is evaluated "by examining the substance of the potentially applicable laws to determine whether 'there is distinction' between them ... if not, there is no choice-of-law issue to be resolved."  *Camp Jaycee*, 197 N.J. at 139-140.  If a conflict does exist, the Court moves to the second part of the test to "determine which jurisdiction has the 'most significant relationship' to the claim."  *Maniscalco*, 709 F.3d at 207.  Specifically, in breach of contract claims, the court must determine which forum has the most significant relationship with both the parties and contract.  *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 289 (3d Cir. 2017); *see Jackson v. Midland Funding LLC*, 468 F. App'x 123, 126-27 (3d Cir. 2012); *Tobin v. Samsung Elecs. Am.*, No. 18-12473, 2019 WL 1399557 (D.N.J. Mar. 27, 2019).

In that regard, a distinction exists between the statute of limitations rules in New Jersey and those of the other potential forums, which include California, New York, and Florida.  First, New Jersey and New York each have a six-year statute of limitations for breach of contract claims not governed by the Uniform Commercial Code.  N.J.S.A § 2A:14-1; N.Y. C.P.L.R. § 213(2) and N.Y. C.P.L.R § 214(3).  However, in Florida, actions for breach of contract are subject to a five-year statute of limitations, s*ee McLean v. GMAC Mortg. Corp.*, No. 6-22795, 2008 U.S. Dist.

LEXIS 36143, at *49, 2008 WL 1956285 (S.D.Fla. May 2, 2008) and Fla. Stat. § 95.11(2)(b), while in California, as stated above, the statute of limitations is four years. S*ee* Cal. Com. Code § 2725; Cal. Civ. Proc. Code § 339; *Warren*, 2017 WL 4876212, at *6.

Based on this conflict, the next step in the Court's analysis is typically to determine which forum has the most significant relationship to Metus Capital's breach of contract claim. *See Maniscalco*, 709 F.3d at 207. To do so, the New Jersey Supreme Court has adopted the principles set forth in Restatement (Second) of Conflicts of Laws, at Section 188 (respectively, "the Restatement" and "Section 188") to resolve choice of law issues. Section 188 provides that a court should take into account: (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflict of Laws § 188. Additionally, the Court should consider the more general factors set out in Section 6 of the Restatement: (1) the interests of interstate comity, (2) interests of the parties, (3) interest underlying the field of law, (4) interests of judicial administration, and (5) competing interests of the states. *Id.* § 6; *Camp Jaycee*, 197 N.J. at 147; *see also Jackson v. Midland Funding LLC*, 468 Fed. Appx. 123, 126-27 (3d Cir. 2012).

Here, neither Plaintiff nor Defendants provided the Court with a meaningful choice of law analysis. Rather, Plaintiff sought to reserve his right to address choice of law, should Metus Capital be "permitted to proceed with [its] Amended Counterclaim," and Metus Capital maintained that a choice of law analysis is premature at this stage of the litigation. (Pl. Moving Br., at 15, n.8; Def. Opp. Br., at 15.) Nonetheless, the representations made by the parties on this motion is sufficient for the Court to, at least, find that California law does not govern Metus Capital's breach of contract claim.

Plaintiff indicates that California law may govern the 2008 Fees dispute merely because he resided in California "at the time of entering into the IMA." (Pl. Moving Br. 14.) That connection, however, is outweighed by the fact that Metus Capital was organized and had its principal place of business in Florida at the time the IMA was executed, and more importantly, Plaintiff argues that New York actually maintains the "most substantial relationship" to the dispute. (*Id.* at 14.) Indeed, Plaintiff acknowledges that his investment funds were held with Wellington Shields and managed by Metus Capital in New York, and that all communications between the parties related to the IMA were sent to Defendants in New York. Moreover, neither Plaintiff nor Defendants represent that California was the place of contracting, the place of negotiation, or the place of performance with respect to either the IMA or the September 2010 Letter Agreement. Rather, Defendants represent that to the extent the IMA was even negotiated at all, those discussions occurred while Plaintiff resided in Thailand. Therefore, based on the information provided by the parties, I find that California's role in the 2008 Fees dispute is far outweighed by the Section 188 factors supporting other states. Thus, California law does not apply.

As a result, regardless of whether the September 2010 Letter Agreement survived Plaintiff's termination of Metus Capital in 2016, the outcome remains the same. To be clear, if the September 2010 Letter Agreement did not survive Plaintiff's termination of Metus Capital, then Metus Capital's claim accrued, at the earliest, in April 2016. As such, in order for New Jersey or New York's six-year statute of limitations to bar the breach of contract claim, that claim would have to be filed no later than April 2022, whereas in order for Florida's five-year statute of limitations to act as a bar, Metus Capital's breach of contract claim would need to be filed after April 2021. Of course, if the September 2010 Letter Agreement, which deferred the 2008 Fees until 2019, survived Klapper's termination of the IMA in April 2016, then none of the state's

statute of limitations are implicated.[10]   Because Defendants filed their Answer and Amended Counterclaims on July 20, 2020,[11] Metus Capital's breach of contract claim is timely under any potentially applicable statute of limitations.

> 2. *Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II) and Conversion (Count III)*

Plaintiff also argues that Metus Capital's counterclaims for breach of the implied covenant of good faith and fair dealing and conversion, as they relate to the 2008 Fees, should be dismissed based on a failure to state a cause of action.   Specifically, Plaintiff argues that Metus Capital's conversion claim is merely an attempt to transform the alleged breach of contract claims into a tort claim, which, according to Plaintiff, courts have routinely rejected.   (Pl. Moving Br., 22) (citing *Gordon v. Nice Sys., Inc.*, 2020 WL 2316278, *4 (D.N.J. May 11, 2020) ("New Jersey courts have expressly restricted application of the doctrine of conversion when it seeks to turn a claim based on breach of contract into a tort claim.")   According to Plaintiff, the conversion claim, like the breach of contract claim in Count I, merely seeks to recover a debt allegedly owed by Klapper, *i.e.*, the 2008 Fees.   Plaintiff further argues that pursuant to the IMA, any management and performance fees owed to Metus were to be paid from Klapper's account, and the IMA makes clear that Klapper—not Metus Capital or Sullivan—is the "sole owner of all assets in the Account." (Pl. Moving Br., 24) (citing the IMA, Ex. A to Maloney Decl. at §§ 4-5).   Therefore, Plaintiff submits that the "funds used to pay any management or performance fees to Metus was never Metus' money in the first instance."   (Pl. Moving Br., 24.)   Similarly, Plaintiff argues that Metus

---

[10]     A choice of law analysis must be undertaken by the parties for future disputes regarding these agreements.

[11]     I also note that Metus Capital filed its initial Answer and Counterclaims on May 14, 2020, which included a breach of contract claim against Plaintiff arising from Klapper's purported failure to pay the 2008 Fees.   (ECF No. 36.)

Capital's breach of the covenant of good faith and fair dealing claim should be dismissed because it is duplicative of, and arises from, the same facts as Defendants' breach of contract claim.  (Pl. Moving Br., 25.)

I agree with Plaintiff that Metus Capital's conversion and breach of the implied covenant of good faith and fair dealing claims should be dismissed because they are duplicative.  First, with respect to the conversion claim, "New Jersey courts have expressly restricted application of the doctrine of conversion when it seeks to turn a claim based on breach of contract into a tort claim." *D & D Tech., Inc. v. CytoCore, Inc.*, No. 14-4217, 2014 WL 4367314, at *4 (D.N.J. Sept. 2, 2014).[12]  Here, Metus Capital alleges only that the 2008 Fees, which totaled $173,200, plus appreciation, belonged to Metus Capital by virtue of the modification to the IMA.  As such, Metus Capital alleges that in accordance with the IMA and the subsequent September 2010 Letter Agreement, Klapper had no right to the 2008 Fees, and that by failing to remit the 2008 Fees to Metus Capital, Plaintiff wrongfully converted the funds.  Accordingly, the facts underlying this claim are clearly identical to Metus Capital's breach of contract claim, and it is therefore dismissed.

---

[12]    The Court need not conduct a choice of law analysis because there is no conflict between the law in New Jersey and the law in New York or Florida on this issue.  *See Remede Consulting Grp. Inc. v. Hamer*, No. 19-3950, 2021 WL 430898, at *5 (E.D.N.Y. Feb. 8, 2021) (applying New York law and dismissing conversion claim that was duplicative of breach of contract claim); *Fesseha v. TD Waterhouse Inv'r Servs., Inc.*, 305 A.D.2d 268, 269 (1st Dep't 2003) (finding that a court must dismiss any conversion claim that is "predicated on a mere breach of contract" absent "independent facts sufficient to give rise to tort liability"); *Walker v. Figarola*, 59 So.3d 188, 190 (Fla. 3d DCA 2011) ("This is not to say that there can never be a claim for civil theft or conversion if there is a contractual relationship between the parties, but rather that the civil theft or conversion must go beyond, and be independent from, a failure to comply with the terms of a contract."); *see also Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 495 (Fla. 3d DCA 1994) ("[A] plaintiff may not circumvent the contractual relationship by bringing an action in tort.").

Similarly, New Jersey law[13] provides that "[w]here a party has breached a specific term of a contract, that party cannot be found separately liable for breaching the implied covenant of good faith and fair dealing when the two asserted breaches basically rest on the same conduct." *Spellman v. Express Dynamics, LLC*, 150 F. Supp. 3d 378, 379 (D.N.J. 2015) (internal quotation marks omitted). Thus, although Federal Rule of Civil Procedure 8(d) permits a party to plead multiple claims alternatively or hypothetically, "where it is undisputed that a valid and unrescinded contract governs the conduct at issue, breach of implied duty claims can be dismissed at the motion to dismiss stage." *Id.* at 390. Here, Count II is clearly premised on the IMA and September 2010 Letter Agreement—an alleged "valid and unrescinded contract." Moreover, the Answer and Amended Counterclaims do not even attempt to differentiate the allegations relating to the breach of contract claim asserted against Plaintiff in Count I and the allegations relating to the breach of the implied covenant of good faith and fair dealing in Count II. Rather, the Complaint merely alleges that "by virtue of Klapper's conduct, as set forth in detail above, Klapper has breached the implied covenant of good faith and fair dealing owed to Metus Capital in connection with the IMA and the parties' agreement with respect to the 2008 Fees." (Answer, at ¶ 87.) Presumably, that "conduct" is the same conduct that gave rise to Metus Capital's breach of contract claim in Count I. *Cedar Holdings, LLC v. Menashe*, No. 16-7152, 2017 WL 1349321, at *3 (D.N.J. Apr. 7, 2017) ("A conclusory statement that a breach of contract is done in bad faith is insufficient to state a

---

[13]     Again, no choice of law analysis is required because the laws of New York and Florida are consistent with New Jersey law on this issue. *See Danusiar v. Auditchain USA, Inc.*, No. 20-1477, 2020 WL 6126378, at *9 (S.D.N.Y. Oct. 8, 2020) (noting that a breach of the implied covenant of good faith and fair dealing claim that is duplicative of a breach of contract claim must be dismissed); *Onuss Ortak Nokta Uluslararasi Haberlesme Sistem Servis Bilgisayar Yazilim Danismanlik v. Dis Ticaret Ltd. Sirketi*, No. 09-80720, 2010 WL 935972, at *3 (S.D. Fla. Mar. 10, 2010) (finding that a "breach of the implied covenant of good faith and fair dealing cannot be advanced when the allegations underlying that claim are duplicative of the allegations supporting the breach of contract claim.").

[separate] claim for breach of the implied covenant of good faith.")  Accordingly, this claim is duplicative of Metus Capital's breach of contract claim, and therefore, Count II is dismissed.

**B.      Counterclaims Related to the Standstill Agreement and Operating Agreement**

Counts IV, V, VI, VII, IX, and X assert counterclaims in connection with the Standstill Agreement and Operating Agreement,[14] executed in connection with the Thomas Paine House. With respect to the Standstill Agreement, Defendants assert claims for breach of contract (Counts IV and X)[15] and breach of the implied covenant of good faith and fair dealing (Count V). Specifically, Defendants allege that Plaintiff breached the terms of the Standstill Agreement by failing to properly manage and operate TPH and the Property, by allowing the Property to "languish and fall into disrepair," and by failing to make any efforts to sell the Property during the Standstill Period. (Answer, at ¶¶ 97-98.)  According to Defendants, this conduct resulted in a decrease in marketability of the Property, foreclosure, and a sale significantly below its fair market value. (*Id.* at ¶ 99.) As for the Operating Agreement, Sullivan asserts claims for breach of contract (Count VI), breach of the implied covenant of good faith and fair dealing (Count VII), wrongful dissolution in violation of the Revised Uniform Limited Liability Company Act ("LLC Act"), N.J.S.A. 42:2C-48(a) (Count VIII), and breach of fiduciary duty (Count IX).[16]  Here, Sullivan

---

[14]     Unlike the IMA, the Standstill Agreement and Operating Agreement contain choice of law provisions which provide that New Jersey law governs. (*See* Standstill Agreement, Ex. C to Maloney Decl. at ¶ 14; Operating Agreement, Ex. E to Maloney Decl. at § 6.2.)

[15]     Count X asserts a claim for breach of the Standstill Agreement on behalf of Sullivan based on the same conduct as alleged in Count IV, however, Count X is purportedly brought by "Sullivan directly, or, in the alternative, derivatively on behalf of TPH" against Klappper. Specifically, Defendants allege that TPH is an intended third-party beneficiary of the Standstill Agreement because the parties intended that TPH benefit from the agreement, and that as a result of Klapper's breach of the Standstill Agreement, TPH has been damaged. With respect to Sullivan, Count X is duplicative. As for TPH, Plaintiff did not sue TPH in this action, and therefore, to the extent that TPH wishes to formally intervene in this lawsuit, it must do so properly. Accordingly, Count X is dismissed.

[16]     Count IX is dismissed with respect to TPH for the same reasons as Count X.

alleges that Plaintiff breached the Operating Agreement and his fiduciary duties of loyalty and care as Manager of TPH based on the same conduct that resulted in a breach of the Standstill Agreement, namely Klapper's neglect of the Property and failure to manage TPH.  In addition, Sullivan alleges that Plaintiff breached the Operating Agreement by dissolving TPH without Sullivan's consent.  Sullivan claims that under Section 5.1 of the Operating Agreement and N.J.S.A. 42:2C-48(a), TPH could only be dissolved in certain circumstances, none of which were present according to Sullivan, and Plaintiff made no meaningful efforts to obtain Sullivan's consent for dissolution, nor did he notify Sullivan of the dissolution.

In the instant Motion to Dismiss, Plaintiff contends that the counterclaims for breach of contract (Counts IV and VI) and breach of fiduciary duty (Count IX) should be dismissed for failure to state a claim because even if Defendants could establish that Plaintiff breached the Standstill Agreement and Operating Agreement, Defendants have not alleged sufficient facts to show that Defendants actually sustained any damages, let alone damages caused by an alleged breach of those agreements.  (Pl. Moving Br., 33-34.)  With respect to Defendants' counterclaims for breach of the implied covenant of good faith and fair dealing (Counts V and VII), Plaintiff submits that these claims should be dismissed because even if Defendants' claims for breach of the Standstill Agreement and breach of the Operating Agreement survive, Counts V and VII are duplicative.

To state a claim for breach of contract and breach of fiduciary duty under New Jersey law, a plaintiff must allege damages.  *See Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (finding that to state a claim for breach of contract, a plaintiff must allege "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations."); *Torsiello v. Strobeck*, 955 F. Supp.

2d 300, 311 (D.N.J. 2013) (finding that a "breach of a fiduciary obligation is a tort claim, and thus requires the showing of a duty, a breach, an injury, and causation.") (citation omitted).

Here, as indicated above, Plaintiff appears to only contest that Defendants' claims for breach of contract and breach of fiduciary duty in connection with the Standstill Agreement and Operating Agreement fail to adequately allege damages.  Thus, the Court does not address the remaining elements of those respective claims.  Instead, the Court will separately discuss each Defendant's claims as to damages.

### 1. *Metus Capital*

First, the Court finds that Metus Capital has failed to adequately allege damages in order to state a cause of action for breach of the Standstill Agreement.  In response to Plaintiff's Motion to Dismiss, Defendants argue that Sullivan and Metus Capital have sufficiently alleged damages based on a breach of the Standstill Agreement because the Standstill Agreement provides that had the Property been sold, as intended, "Sullivan would be entitled to a set-off of 175% of any damages Klapper may be awarded in his action against Defendants to the extent the sale price exceeded the mortgage, taxes, and liens on the Property, and other liabilities of TPH."  (Def. Opp. Br., at 24) (citing Answer at ¶¶ 93-99.)  Put simply, Defendants argue that Plaintiff's breach of the Standstill Agreement damaged them because the Property was foreclosed upon and sold at a sheriff's sale for little value.

A review of the Standstill Agreement reveals, however, that only Sullivan, not Metus Capital, was entitled to the set-off and that the set-off was to be distributed against the damages awarded, <u>if any, in the Klapper Litigation</u>."  (*See* Standstill Agreement, Ex. C to Maloney Decl. at ¶ 12) (emphasis added).  In accordance with the express terms of the agreement, the "Klapper Litigation" is defined as the action initiated by Klapper "in the Superior Court of New Jersey, Law

Division, Monmouth County on August 3, 2016, captioned *Peter Klapper v. Richard G. 'Chad'*

*Sullivan, Metus Capital Group, LLC, Thomas Paine House, LLC, et al.*, Docket No. MON-L-2697-

16." Here, nowehere in the agreement does Metus Capital receive any benefits from the set-off.

Indeed, Defendants have pointed to no other provision of the Standstill Agreement whereby Metus

Capital would receive any benefit from the contract.  Even if Metus Capital could benefit from the

set-off provision, the Amended Counterclaims fail to allege whether the dismissed Klapper

Litigation was ever revived, and if so, whether the court in that case ever entered a final judgment

in favor of Klapper.  Without these allegations, any claim on behalf of Metus Capital for damages

is purely speculative and cannot support a cause of action for breach of contract.  Accordingly,

based on Metus Capital's failure to sufficiently allege damages flowing from Plaintiff's purported

breach of the Standstill Agreement, Metus Capital's counterclaims in Counts IV and V are

dismissed.[17]

       *2.  Sullivan*

As it pertains to Sullivan, however, the Court finds that he has sufficiently alleged

quantifiable damages resulting from Plaintiff's breaches of the Standstill Agreement and the

Operating Agreement.  With respect to his claim for breach of the Standstill Agreement, Sullivan

alleges that Plaintiff breached the agreement by failing to properly manage and operate TPH and

the Property, by allowing the Property to "languish and fall into disrepair," and by failing to make

any efforts to sell the Property during the Standstill Period. (Answer, at ¶¶ 97-98.)  Based upon

this conduct and mismanagement, Sullivan further alleges that the Property fell into foreclosure,

which resulted in a sale far below market value.  Indeed, Sullivan alleges that the Property, a

---

[17]     Metus Capital's claim for breach of the implied covenant of good faith and fair dealing in
Count V is dismissed for the same reason as Count IV, *i.e.*, a failure to allege damages.

"multi-million dollar estate" was sold at a sheriff's sale for $1,000 in October 2017, and that shortly thereafter, it was sold for $2.2 million and assessed for tax purposes at $3.6 million. (*Id.* at ¶ 9.) Importantly, Sullivan also alleges that TPH owned the Property, and by virtue of his ownership interest in TPH, he was entitled to 22% of all distributions made by TPH after the first $1 million of distributions. (*Id.* at ¶ 62.) Accordingly, Sullivan claims that because of the low sale price, TPH was unable pay the PLP mortgage or pay any distributions to its members, and therefore, he suffered damages. (*Id.* at ¶¶ 141-48.) With respect to Sullivan's claims arising from the Operating Agreement, Sullivan has adequately pled damages based on Plaintiff's dissolution of TPH. More specifically, Sullivan alleges that his ownership interest in TPH was invalidated without his knowledge upon Plaintiff's unilateral dissolution of the company. In this regard, the Court agrees with Sullivan that the value of TPH at the time of dissolution, and therefore, the value of Sullivan's interest, if any, remains a factual issue, and therefore, Sullivan's claims will not be dismissed on this basis.

However, regardless of Sullivan's ability to allege damages, the Court dismisses Count VII of Sullivan's Amended Counterclaims, which alleges that Plaintiff breached the covenant of good faith and fair dealing implied in the Operating Agreement, based on the same reasoning as set forth above with respect to Counts II. (S*ee* Section III(A)(2)). Indeed, in identical fashion to Count II, Defendants' Amended Counterclaims alleges only that "[b]y virtue of Klapper's conduct, as set forth in detail above, Klapper has breached the implied covenant of good faith and fair dealing owed to Sullivan in connection with the Operating Agreement." *See Cedar Holdings, LLC*, No. 16-7152, 2017 WL 1349321, at *3 (D.N.J. Apr. 7, 2017). This is duplicative and insufficient, and therefore, Count VII is dismissed.

Finally, in Count VIII, Sullivan asserts an independent cause of action under N.J.S.A. 42:2C-48(a) of the LLC Act for wrongful dissolution.  Indeed, like the Operating Agreement, N.J.S.A. 42:2C-48(a) sets forth grounds upon which a New Jersey limited liability company may be dissolved.  Sullivan claims that because he never consented to the dissolution of TPH and none of the other circumstances provided in N.J.S.A. 42:2C-48(a) had occurred, that Klapper wrongfully dissolved and terminated TPH.  As a result, Sullivan requests that the dissolution and termination of TPH be nullified and TPH be reinstated as of July 31, 2019.

Here, Plaintiff's Motion to Dismiss fails to adequately address dismissal of Count VIII.  In fact, the Motion to Dismiss argues only that this claim should be dismissed for the same reason that Sullivan's breach of contract claim in Count VI should be dismissed.  Namely, Plaintiff argues that because TPH's purpose as an entity terminated once the Property was foreclosed upon and sold, dissolution of TPH was proper.  The Court rejects this argument because both the Operating Agreement and N.J.S.A. 42:2C-48(a) set forth specific circumstances in which a limited liability company may be dissolved.  None of those circumstances provides for dissolution simply because the "purpose" of the entity no longer exists.  Rather, TPH was a legal entity, and therefore, it must be dissolved properly and in accordance with any relevant statutory provisions or contractual provisions negotiated and agreed to by the parties.  Here, Sullivan adequately alleges that none of the circumstances set forth in N.J.S.A. 42:2C-48(a) had occurred when Plaintiff unilaterally dissolved TPH, and therefore, Plaintiff's position is rejected.

But, as a legal matter, the Court questions whether N.J.S.A. 42:2C-48(a) provides Sullivan with a private right of action, and even if so, whether Sullivan's requested relief, *i.e.*, nullification and reinstatement, is an available remedy under the statute.  Indeed, neither Plaintiff nor Sullivan provide the Court with any instructive case involving an independent cause of action arising under

this specific provision of the LLC Act.  Further, because the LLC Act specifically provides that, in cases where there is an operating agreement, "the operating agreement governs," it would seem to follow that any claim for wrongful dissolution would arise under Section 5.1 of the Operating Agreement under a breach of contract theory of liability (which Sullivan has asserted in Count VI). N.J.S.A. 42:2C-11; *Callas v. Callas*, No. CV 14-7486, 2017 WL 1102629, at *5 (D.N.J. Mar. 24, 2017) (confirming that the operating agreement governs).  Accordingly, the Court is doubtful that an independent cause of action is proper under N.J.S.A. 42:2C-48(a); however, not having the benefit of substantive arguments from the parties, the Court denies Plaintiff's motion to dismiss with respect to this claim without prejudice, such that he may renew his arguments for dismissal when appropriate.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's Motion to Dismiss is **GRANTED** in part and **DENIED** in part.  With respect to Metus Capital's counterclaims in connection with the IMA, Plaintiff's motion is denied as to Metus Capital's breach of contract claim (Count I), but granted as to the breach of the implied covenant of good faith and fair dealing (Count II) and conversion (Count III) claims, because those claims are duplicative of Count I.

As for Defendants' counterclaims for breach of the parties' Standstill and Tolling Agreement (Count IV) and breach of the implied covenant of good faith and fair dealing related to the Standstill and Tolling Agreement (Count V), Plaintiff's motion is granted with respect to Metus Capital based on Metus Capital's failure to adequately allege damages, but denied as to Sullivan.

Finally, as it relates to Sullivan's counterclaims asserted in Counts VI, VII, VIII and IX, Plaintiff's motion is denied as to Sullivan's claim for breach of the TPH Operating Agreement

(Count VI), but Plaintiff's motion is granted with respect to Sullivan's claim for breach of the implied covenant of good faith and fair dealing in connection with TPH's Operating Agreement (Count VII), because that claim is duplicative of Count VI.  Counts IX and X are also dismissed to the extent they attempt to assert claims derivatively on behalf of TPH, an entity which has not formally intervened in this case.  In sum, Counts II, III, V, VII, IX, and X are dismissed in their entirety.

Dated: March 29, 2021                          /s/ Freda L. Wolfson
                                               Freda L. Wolfson
                                               U.S. Chief District Judge