<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PETER KLAPPER,<br><br>              Plaintiff,<br><br>   v.<br><br>RICHARD G. SULLIVAN and METUS CAPITAL GROUP, LLC,<br><br>              Defendants. | Civil Action No. 17-13137 (GC) (JBD)<br><br><u>OPINION</u> |

<u>CASTNER, District Judge</u>

**THIS MATTER** comes before the Court upon Plaintiff Peter Klapper's Motion for Summary Judgment (ECF No. 104) and Defendants Richard Sullivan and Metus Capital Group, LLC's Amended Partial Motion for Summary Judgment (ECF No. 106). The motions are brought pursuant to Federal Rule of Civil Procedure ("Rule") 56(a). The Court held oral argument on June 7, 2023 and has carefully considered the parties' submissions. For the reasons set forth below, and other good cause shown, Plaintiff's Motion is **GRANTED** in part and **DENIED** in part; and Defendant's Motion is **GRANTED** in part and **DENIED** in part.

## I.   BACKGROUND

### A.   Factual Background

#### 1.   *The 2008 Fee Agreement*

In 2007, Klapper retained Sullivan and Metus to serve as his investment manager. (ECF No. 104-2 ¶ 2; ECF No. 109-2 ¶¶ 1-6.[1]) Sullivan is Metus's sole manager and member. (ECF No.

---

[1]      The disputed and undisputed facts surrounding this action, as revealed through discovery,

104-2 ¶ 4; ECF No. 109-1 ¶ 4.)  Defendants allege that on September 6, 2007, the two sides entered into an Investment Management Agreement (IMA), which outlined Metus's authority to manage certain of Klapper's assets and investments — mainly traditional securities.  (ECF No. 104-2 ¶¶ 3, 6; ECF No. 109-1 ¶¶ 3, 6.)  While Klapper denies that he ever executed the IMA, he did allow Metus to invest Klapper's personal funds into traditional securities and came to trust Defendants because of the positive results.  (ECF No. 104-2 ¶¶ 3 n.2, 6.)  The IMA provided that Klapper would pay Metus an annual management fee of two percent of the assets under management, and twenty percent of the amount of assets that Metus managed which outperformed the S&P 500 in a calendar year.  (*Id.* ¶ 180; ECF No. 104-8 at 7-8.)  Klapper claims to have paid Sullivan the fees. (ECF No. 104-2 ¶¶ 187-192.)  Sullivan, however, contends that Klapper did not pay the fees in 2008 because they agreed to defer payment for ten years — the parties agreed that Klapper could keep the fees invested, and that the fees would be used to fund a "French villa investment with compounded monies from [the] 2008 [F]ees" through a company owned and controlled by Sullivan, with the parties evenly splitting any rental revenues from the French villa. (*Id.* ¶ 196; ECF No. 109-2 ¶¶ 78-89.)  Sullivan asserts that Klapper ultimately did not pay the fees.  (ECF No. 109-2 ¶ 89.)

### 2. *The China Project*

In January 2010, Sullivan approached Klapper about a real estate investment that the parties refer to as the "China Project."  (ECF No. 104-2 ¶ 10; *see* ECF No. 106-2 ¶¶ 97-98.)  The

---

are set forth in the parties' submissions in accordance with Local Civil Rule 56.1.  (*See* Plaintiff's Statement of Material Facts, ECF No. 104-2; Defendant's Statement of Material Facts, ECF No. 106-2; Defendant's Responsive Statement of Material Facts, ECF No. 109-1; Defendant's Supplemental Statement of Material Facts, ECF No. 109-2; Plaintiff's Response and Counterstatement of Material Facts, ECF No. 110-1; Defendants' Reply to Plaintiff's Counterstatement of Material Facts, ECF No. 113-1; and Plaintiff's Response to Defendants' Supplemental Statement of Material Facts, ECF No. 114-1.)

parties disagree over the China Project's purpose.  Klapper alleges that he understood the project to be located in China and that he agreed to invest €315,000.  (ECF No. 104-2 ¶ 13.)  Sullivan contends that the investment was for a real estate project in Sea Bright, New Jersey.  (ECF No. 106-2 ¶ 20.)  Klapper claims that he did not understand the investment to be intended for a property in Sea Bright.[2]  (ECF No. 104-2 ¶ 16.)  On February 8, 2010, Klapper wired €315,000 from BCI, Ltd (BCI), a Bermudan company that he owned, to Sullivan's bank account in China.  (*Id.* ¶ 14; ECF No. 106-2 ¶ 30.)

Klapper alleges that the €315,000 investment was transferred to Sullivan's account in New York, but the funds were never used to improve any real property in China or Sea Bright.  (ECF No. 104-2 ¶¶ 20-21.)  Sullivan disputes this claim, and argues that he first used a portion of Klapper's investment to purchase a warehouse in Asbury Park, New Jersey to store materials for the construction of the Sea Bright property.  (ECF No. 106-2 ¶ 34.)  Sullivan also alleges that he advised Klapper about his intentions before he purchased the warehouse.[3]  (*Id.* ¶¶ 34-35.)  Sullivan further argues that he used the rest of Klapper's investment for other expenses related to the Sea Bright property, such as paying for an architect, surveyor, and lawyer.  (*Id.* ¶ 36.)  According to Sullivan, Klapper never believed that the project was located in China, and the only reason the parties ever referred to the project as the "China project" was because Klapper was being audited by the IRS and had tax concerns over the investment, and he therefore asked Sullivan to refer to the investment as the "China project" as a sort of "code language."  (ECF No. 109-1 ¶ 13.)

---

[2]    Klapper admits that on January 31, 2011, he received an email from Sullivan on Metus letterhead, stating "performance was affected negatively by the addition of 315,000 Euro which is slated for the construction of the Sea Bright beach/oceanfront property. . . . Groundbreaking is now set for March hopefully we can sell the house in late 2011, early 2012."  (ECF No. 104-2 ¶ 19.)

[3]    Klapper contends that he was not notified of the warehouse purchase until after the fact. (ECF No. 104-2 ¶¶ 23-24.)

### 3.    *The Thomas Paine House*

According to Sullivan, after a hurricane hit the New Jersey coast in August 2011, he and Klapper discussed moving the €315,000 investment to a property in Atlantic Highlands, New Jersey that Sullivan owned with a partner, Curtis Willing.  (ECF No. 106-2 ¶ 51.)  The parties refer to the house located on the Atlantic Highlands property as the Thomas Paine House (TPH).  (*Id.*; ECF No. 104-2 ¶ 49.)  On June 14, 2012, Sullivan told Klapper that the investment in the Atlantic Highlands property was in the range of $3.3 million to $3.5 million, and that the plan was to sell the house in two to three years for a profit.  (ECF No. 106-2 ¶ 55.)  On July 14, 2012, Sullivan claims that he sent Klapper a letter documenting the transfer of the €315,000 investment into the TPH.  (*Id.* ¶ 58.)  Specifically, Sullivan claims to have transferred the €315,000 investment to the Point Lookout Partnership (PLP), which was the partnership between Sullivan and Willing that owned the home.  (*Id.* ¶ 58-63.)  In return, Sullivan transferred to Klapper a twenty-five percent stake in PLP.  (*Id.* ¶ 64.)  Klapper, however, alleges that at that time, Sullivan did not have the authority to transfer an interest in PLP to Klapper, and that PLP's bank statements do not reflect this transfer.  (ECF No. 104-2 ¶¶ 32-33.)

The parties agree that in the summer of 2014, Sullivan proposed that Klapper invest an additional $1 million into TPH.  (*Id.* ¶ 61; ECF No. 109-1 ¶ 61.)  Sullivan wanted to remove Willing from the project, operate TPH as a bed-and-breakfast and event space, and then sell TPH in two to five years for a profit.  (ECF No. 104-2 ¶ 62; ECF No. 106-2 ¶¶ 71-72.)  On July 28, 2014, Klapper wired $1 million to Sullivan.  (ECF No. 104-2 ¶ 65; ECF No. 106-2 ¶ 74.)

Several disputes have arisen around Klapper's additional $1 million investment in TPH. For instance, Klapper claims that Sullivan never informed him about a lawsuit against Sullivan that Willing and PLP filed in September 2014.  (ECF No. 104-2 ¶ 71-75.)  PLP and Sullivan settled

on November 1, 2014, wherein Sullivan agreed to purchase the TPH lot from PLP in exchange for $1 million in cash, which Sullivan used to pay off a First Republic Bank Mortgage on the lot. (*Id.* ¶ 73.)  Under the settlement, Sullivan also secured a $2.5 million mortgage on the lot in favor of PLP.   (*Id.*)   Klapper claims that Sullivan never informed him of the PLP litigation, PLP's allegations of embezzlement and fraud, the PLP settlement, the First Republic Mortgage (and the payoff), and the new $2.5 million mortgage on the lot.  (*Id.* ¶ 75.)  Moreover, Klapper claims that due to the PLP mortgage, the only way he could have made a profit on TPH was if TPH sold for more than $3.5 million.  (*Id.* ¶ 86.)  Sullivan disagrees and argues that he notified Klapper about the mortgage on the property.  (ECF No. 106-2 ¶¶ 80-83; ECF No. 109-1 ¶ 86.)

Starting in 2014, Sullivan began to use TPH as a short-term rental and hosted several events. (ECF No. 104-2 ¶¶ 95-96.)  These uses of TPH violated various Borough of Atlantic Highlands municipal codes and regulations, which resulted in Sullivan and TPH receiving sixty citations.  (*Id.* ¶ 97.)   As a result, the Borough filed a lawsuit to enjoin Sullivan and TPH from using TPH as a rental property, bed-and-breakfast, or event space.  (*Id.* ¶ 98.)  In November 2016, a state court granted the Borough a permanent injunction against TPH and Sullivan.  (*Id.* ¶ 99.)  Klapper alleges that Sullivan never told him about the citations, lawsuit, or injunction, or even the events and rentals at issue.  (*Id.* ¶¶ 96, 100.)  In fact, Klapper alleges that in January 2015, Sullivan told him that he expected TPH to be open in "mid-February."   (*Id.* ¶ 101.)   Klapper then alleges that Sullivan sent him a balance sheet for TPH that was fraudulent because it omitted the $2.5 million mortgage.  (*Id.* ¶¶ 102-107.)  Klapper became suspicious of Sullivan and in April 2016, Klapper fired Defendants and told them that he wanted to cash out of all of his investments with them, including TPH.  (*Id.* ¶¶ 114-115.)  Sullivan alleges that he returned all of Klapper's funds that had been invested in securities, but not those invested in TPH because they were illiquid.  (ECF No.

106-2 ¶ 100.)

### 4.    *The Standstill and Operating Agreements*

On August 3, 2016, Klapper filed a lawsuit against Sullivan in the Superior Court of New Jersey, Monmouth County, Law Division (the State Court Action), for fraud, violation of the New Jersey Consumer Fraud Act, unjust enrichment, conversion, breach of fiduciary duty, and breach of contract.  (ECF No. 104-2 ¶ 149.)  Klapper alleges that he suffered around $1.4 million in damages.  (*Id.* ¶ 148.)  During this same time, Sullivan had allegedly stopped making payments on PLP's $2.5 million mortgage.  (*Id.* ¶ 141.)  This resulted in PLP filing a lawsuit against TPH and Sullivan in August 2016, in which PLP sought to recover the outstanding payments.  (*Id.* ¶¶ 144-145.)

In May 2017, Klapper and Sullivan entered into a Standstill Agreement and Operating Agreement in an effort to minimize TPH's losses and avoid foreclosure.  (*Id.* ¶¶ 150-151.)  The purpose of the Standstill Agreement was to maintain the status quo of the parties' claims in the State Court Action, which then resulted in the parties agreeing to dismiss the State Court Action without prejudice on June 21, 2017.  (*Id.* ¶ 157.)  The Standstill Agreement expired on July 27, 2017.  (*Id.* ¶ 161.)  Moreover, Pursuant to the Operating Agreement, Klapper assumed control of the day-to-day operations of TPH.  (*Id.* ¶ 151.)  Klapper alleges that he attempted to sell the TPH lot and listed it with a realtor with a price of $3.95 million in June 2017.  (*Id.* ¶ 163.)  Sean Griffith, a prospective buyer, offered $2.3 million for the lot in September 2017, and Klapper directed the realtor to make a counteroffer for $3.7 million.  (*Id.* ¶ 166-68.)  Griffith responded with his best and final offer of $2.5 million, which Klapper rejected because he alleges it would have been insufficient to pay the judgment to PLP and would have resulted in the complete loss of his investment.  (*Id.* ¶¶ 169-170.)

On July 27, 2017, an Order of Final Judgment against TPH and Sullivan was entered in the pending foreclosure action in the amount of $2,913,291.69.  (*Id.* ¶ 171.)  After the foreclosure, TPH no longer had any assets.  (*Id.* ¶ 175.)  On July 31, 2019, Klapper filed a certificate of dissolution on behalf of TPH and then filed a certificate of termination for TPH in October 2019. (*Id.* ¶¶ 176-177.)  Sullivan argues that Klapper violated the Operating Agreement by dissolving TPH without his consent.[4]  (ECF No. 106-2 ¶ 113.)  In response, Klapper asserts that the dissolution of TPH could not have damaged Defendants because TPH had no assets at the time of dissolution.  (ECF No. 104-2 ¶ 178.)  Sullivan responds that his damages include his loss of membership interest in TPH, and therefore any rights that TPH had, including TPH's pending lawsuit against the Borough of Atlantic Highlands.  (ECF No. 109-2 ¶ 70.)

## B.    Procedural History

Plaintiff Klapper filed this lawsuit on December 15, 2017.[5]  (ECF No. 1.)  On July 20, 2020, Defendants answered and filed amended counterclaims.  (ECF No. 46.)  Klapper seeks summary judgment on three of the nine causes of action in his Complaint: Count One (Fraud), Count Two (violation of the New Jersey Consumer Fraud Act (NJCFA)), and Count Five (Breach of Fiduciary Duty).  (*See generally* ECF No. 104-1.)  Klapper also moves for summary judgment on several of Defendants' Counterclaims: Counterclaims One (Breach of the 2008 Fee Agreement), Four (Breach of the Standstill Agreement), Six (Breach of the Operating Agreement), Eight (seeking nullification of the dissolution and termination of TPH) and Nine (Breach of Fiduciary Duty).  (*Id.*)  On September 2, 2022, Defendants moved for summary judgment on Counts One

---

[4]    While the parties agree that Klapper attempted to notify Sullivan of TPH's dissolution in a letter, Sullivan argues that Klapper sent the letter to "an incomplete and/or inaccurate street address."  (ECF No. 110-1 ¶¶ 113-114.)

[5]    The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1).

(Fraud), Two (violation of the NJCFA), Three (Unjust Enrichment), Four (Conversion), Seven (Tortious Interference with Prospective Economic Advantage), and Nine (Breach of Fiduciary Duty) of Plaintiff's Complaint.  (*See generally* ECF No. 106-1.)  Sullivan also moved for summary judgment on Counterclaim Six (Breach of the Operating Agreement).  (*Id.*)

The Court held oral argument on the motions on June 7, 2023.  At oral argument, the Court denied summary judgment for both parties on Count One (Fraud) as to the China Project, and reserved decision on Count One as to TPH.  (*See* ECF No. 119 at 35-36, 54.[6])  The Court also granted summary judgment in Defendant's favor on Count Two under the NJCFA.  (*Id.* at 57-58.)  The Court reserved decision on the remaining portions of the motions.

## II.   <u>LEGAL STANDARD</u>

"Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure."  *In re Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011).  Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)).  "A fact is material if—taken as true—it would affect the outcome of the case under governing law."  *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "And a factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.*

The standard is the same in the context of dueling motions for summary judgment.  *See*

---

[6]     Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

*Auto-Owners Ins.*, 835 F.3d at 402.  "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'"  *Id.*  (quoting 10A Charles Alan Wright, *et al.*, *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

## III.  DISCUSSION

### A.  Plaintiff's Complaint

#### 1.  *Count One (Common Law Fraud)*

Both parties seek summary judgment on Count One of Plaintiff's Complaint for common law fraud.  Count One relates to two separate investments.  The first is Klapper's initial investment of €315,000 to Sullivan (the "China Project").[7]  The second is Klapper's investment of $1 million into TPH.  (*See* ECF No. 104-1 at 38.)

To establish common law fraud under New Jersey law, a plaintiff must show: (1) a material misrepresentation or omission of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance; and (5) damages. *Stockroom, Inc. v. Dydacomp Dev. Corp.*, 941 F. Supp. 2d 537, 546 (D.N.J. 2013) (citing *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997)).  Silence can constitute fraud under circumstances where there is a duty to disclose.  *Id.*  (citing *Perri v. Prestigious Homes, Inc.*, 2012 WL 95564, at *5 (N.J. Super. Ct. App. Div. Jan. 13, 2012)).

---

[7]     Defendants argue that Klapper lacks standing to bring a claim related to the €315,000 investment because those funds were transferred from BCI, Ltd., a former Bermudan holding company solely owned by Klapper.  (*See* ECF No. 106-1 at 31-33.)  At oral argument, the Court rejected Defendants' argument on the record and found that Klapper has standing to assert his fraud claim as it relates to the €315,000 investment.  The Court hereby incorporates its ruling and reasoning set forth on record.  (*See* ECF No. 119 at 5-9.)

### i.    The China Project

The dispute surrounding the China Project stems from Klapper's initial €315,000 investment to Sullivan in 2010.  (*See* ECF No. 104-1 at 12.)  At oral argument, the Court denied the parties' motions for summary judgment on Count One with respect to the China Project.  (ECF No. 119 at 36.)  The Court now reaffirms its ruling.  The record is replete with genuine disputes of material fact, including the purpose of Klapper's initial €315,000 investment; whether Sullivan used the funds for that purpose; and whether Sullivan materially misrepresented how he was using the funds.  (*See* ECF No. 119 at 36.)

Contrary to Klapper's arguments, the dispute surrounding the intended location of the real property is material and would affect the outcome of the case.  *See M.S.*, 969 F.3d at 125. According to Sullivan, the parties always intended to use the 2010 investment for a construction project in Sea Bright, and that was exactly what Sullivan attempted to do by paying for an architect, surveyor, lawyer, and a warehouse to store construction materials.  (ECF No. 106-2 ¶¶ 34-36.)  In support, Sullivan points to various correspondence with Klapper from 2010-2011 referring to New Jersey laws and agencies (ECF No. 106-1 at 36), pictures of beachfront property (ECF Nos. 106-18 & 106-19), and "315,000 Euro which is slated for the construction of the Sea Bright beach/oceanfront property" (ECF No. 106-20).  Then in 2011, both Sullivan and Klapper decided to shift the investment to the Thomas Paine House by transferring the funds to PLP, with Klapper receiving a twenty-five percent interest in the LLC.  (ECF No. 106-2 ¶¶ 51-64.)  Klapper was fully aware that the funds were not invested in real property in China, and any written references to China were "code" words used at Klapper's request due to concerns stemming from an IRS audit. (ECF No. 109 at 10, 23.)

By contrast, Klapper claims that Defendants never used the initial investment in the manner

represented to Klapper and never returned the funds.  (ECF No. 104-2 ¶ 15 n.5.)  Instead, Sullivan falsely represented to Klapper for years that Klapper remained invested in property in China, as evidenced by multiple emails in which the parties refer to "property in China."  (*Id.* ¶¶ 34-39; ECF No. 104-1 at 14-15.)   These disputes are material as to whether Sullivan "omitted and misrepresented material facts about this loan and investment in order to induce Klapper to provide money to Sullivan" as alleged in Count One, making summary judgment in favor of Defendants inappropriate.  (*See* ECF No. 1 ¶ 89.)  Similarly, the sole fact that Klapper was never repaid (regardless of the property's location) is not a sufficient basis to grant summary judgment in his favor on Count One.  (*See* ECF No. 104-1 at 37-38.)

In addition, there is a dispute of material fact as to whether Sullivan's purported transfer to Klapper of a twenty-five percent interest in PLP was fraudulent.  Klapper argues that Sullivan lacked the authority to convey an interest in PLP because Sullivan had no ownership interest in PLP at the time.  (ECF No. 104-2 ¶¶ 31-32.)  In response, Sullivan relies on a 2010 Partnership Agreement between him and Willing for PLP that imposes no restrictions on Sullivan's ability to transfer any portion of his interest in PLP.  (ECF No. 106-2 ¶¶ 61-63; ECF No. 106-26.)  Klapper counters that this agreement relates to a predecessor partnership, and that Willing confirmed through testimony that Sullivan had no authority to transfer any interest in PLP.  (ECF No. 114 at 8-9.)  The Court finds that there is a material dispute as to whether Sullivan had the authority to transfer to Klapper an ownership interest in PLP for purposes of establishing fraud.

For these reasons, the Court denies Defendants' and Klapper's Motions for Summary Judgment on Count One as it relates to the China Project.

### ii.   *The Thomas Paine House*

At oral argument, the Court reserved a ruling on Count One as to Klapper's $1 million

investment in 2014 involving TPH.  (ECF No. 119 at 54.)  Based on the record before this Court, there is a genuine and material dispute as to what information was disclosed to Klapper about the TPH project at the time Klapper made the initial investment in 2014, and whether Klapper was ever advised about the $2.5 million mortgage on the property.

Klapper claims that Sullivan failed to disclose important material facts related to TPH. (ECF No. 104-1 at 38.)  Klapper claims that Sullivan failed to disclose a dispute between Sullivan and Willing that resulted in a lawsuit and subsequent settlement in November 2014, requiring Sullivan to pay PLP $1 million to pay off an existing mortgage on the property and to encumber the property with an additional $2.5 million mortgage.  (*Id.*)  Sullivan argues that in a July 2014 email, Sullivan referenced "long-term debt" on the property (ECF No. 106-31 at 2); and that in a November 2014 letter (ECF No. 104-43 at 3), Sullivan told Klapper that Sullivan would "secure" $2.5 million of the purchase price, which referred to a loan.  (ECF No. 106-1 at 39.)  According to Sullivan, this evidence contradicts Klapper's claim that Sullivan failed to disclose the mortgages (*id.* at 41); while Klapper argues that no rational factfinder could read these exchanges and find that Sullivan adequately disclosed the mortgages (ECF No. 119 at 49-50).  The Court finds that there is a material factual dispute as to whether Sullivan's references to "long-term debt" and his intent to "secure" $2.5 million could be reasonably understood as disclosing the mortgages on the property, and whether such omissions were material.

Additionally, in 2015, Klapper asked Sullivan about the status of the TPH project.  In response, Sullivan provided a "balance sheet," which Klapper claims was false in various respects, including the fact that it did not identify the $2.5 million dollar mortgage.  (*See* ECF No. 104-1 at 22-23; ECF No. 104-54.)  While there appears to be no dispute that the $2.5 million dollar mortgage was not included on the balance sheet (*See* ECF No. 104-54; ECF No. 104-2 ¶ 104; ECF

No. 109-1 ¶ 104), Sullivan claims that the omission was immaterial because Klapper never invested any further into the property after 2014, and he therefore did not rely on this omission. (ECF No. 106-1 at 25.)

With respect to the balance sheet, the Court finds that there is a factual dispute as to whether that omission was material at the time and whether Klapper relied on that omission to his detriment, as Klapper had already invested the $1 million into the project. *See Dewey v. Vokswagen AG*, 558 F. Supp. 2d 505, 528 (D.N.J. 2008) (dismissing the plaintiffs' common law fraud claim because "it is axiomatic that a claim of common-law fraud requires a sufficient allegation of reliance" and the plaintiffs failed to plead reliance on the allegedly fraudulent statements contained in the marketing materials).  Therefore, the Court will deny summary judgment on Count One with respect to all parties.  Genuine disputes exist as to what was disclosed to Klapper in 2014 at the time he made the investment in the TPH; whether Defendant Sullivan's alleged omissions concerning the PLP mortgages were material at that time; and whether Klapper relied on those alleged omissions.  These are questions properly situated for a jury to decide.  *See also Ji v. Palmer*, 755 A.2d 1221, 1228 (N.J. Super. Ct. App. Div. 2000) (noting that whether a statement is material is a question of fact).

### 2.     *Count Two (NJCFA)*

Next, both parties seek summary judgment on Count Two of Plaintiff's Complaint for a violation of the NJCFA.  As previously set forth on the record at oral argument, the Court grants summary judgment in favor of Defendants with respect to Count Two and summarizes its findings herein.  (*See* ECF No. 119 at 57.)

To prevail under the NJCFA, a plaintiff must prove (1) that the defendant was performing an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the

defendant's unlawful conduct and the plaintiff's ascertainable loss.  *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 460-61 (N.J. 1994).  An "unlawful practice" is defined as the "use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid."  N.J. Stat. Ann. § 56:8-2.

Furthermore, "merchandise" includes "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."  *See* N.J. Stat. Ann. § 56:8–1(c). As a result, for the NJCFA to apply, courts require that products and services be marketed and sold to the public.  *See, e.g.*, *Finderne Mgmt. Co., Inc. v. Barrett*, 955 A.2d 940, 954 (N.J. Super. Ct. App. Div. 2008) (collecting cases).  "The entire thrust of the Act is pointed to products and services sold to consumers in the popular sense."  *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 514 (3d Cir. 2006) (citing *Arc Networks, Inc. v. Gold Phone Card Co.*, 756 A.2d 636, 637 (2000) (internal quotations omitted)).  "To qualify as a consumer transaction, which is not defined in the CFA, the challenged services generally must be of the type sold to the general public."  *Finderne Mgmt. Co.*, 955 A.2d at 954.  Courts look to the character of the transaction to determine whether the NJCFA applies.  *Id.*; *J & R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1273 (3d Cir. 1994) (explaining that "it is the character of the transaction . . . which determines if the Consumer Fraud Act is applicable").

Here, the Court finds that Klapper has not provided any evidence indicating that Defendants marketed their investment services regarding the China Project or TPH Project to the greater public.  The record establishes that the "character" of these transactions evinces private

business dealings between the two parties. *See J & R*, 31 F.3d at 1273. Since Klapper has not provided any evidence that Defendants marketed their services to the public as applied to the China Project and the TPH Project, or that these were the types of transactions that Defendants typically sold to the public, Klapper's NJCFA claim cannot stand. *See id.* As a result, summary judgment on Count Two is granted in favor of Defendants and denied as to Klapper.

### 3.   *Count Five (Breach of Fiduciary Duty)*

Klapper moves for summary judgment on Count Five for breach of Defendants' fiduciary duties. (ECF No. 104-1 at 44.) As set forth on the record at oral argument, the parties agree that a fiduciary relationship existed between Klapper and Defendants. (*See* ECF No. 119 at 58.) The parties also agree that the question of whether Defendants breached their duties depends on the same facts at issue in Count One — that is, what information Sullivan was obligated to disclose to Klapper related to the China and TPH Projects, the materiality of such information, and whether Sullivan did in fact disclose such information. (*See id.*) Accordingly, the Court denies Klapper's Motion for Summary Judgment on Count Five — with respect to both the China Project and the TPH investment — for the same reasons the Court denied summary judgment on Count One.

### 4.   *Counts Three (Unjust Enrichment) & Four (Conversion)*

Defendants move for summary judgment on Count Three of Plaintiff's Complaint for Unjust Enrichment and Count Four for Conversion. (ECF No. 106-1 at 46-47.) The parties and Court agreed at oral argument that if factual disputes remain with respect to Count One, that factual issues would likewise remain with respect to Counts Three and Four. (ECF No. 119 at 60.) Therefore, the Court denies Defendants' Motion for Summary Judgment on Counts Three and Four of Plaintiff's Complaint due to the disputes of material fact identified in Count One.

### 5.     *Count Seven (Tortious Interference)*

Defendants also seek summary judgment on Count Seven of Plaintiff's Complaint for Interference with a Prospective Economic Advantage.  (ECF No. 106-1 at 49.)  At oral argument, Defendants argued that summary judgment should be granted with respect to this claim because New Jersey law does not recognize a claim for tortious interference where the "interference" is merely the loss of the plaintiff's investment.  (*See* ECF No. 119 at 61-62.)  Put differently, Defendants argue that Klapper has not identified some other project or business relationship that Defendants allegedly sabotaged, which is the "typical situation" in claims for tortious interference. (*Id.* at 62.)

Under New Jersey Law, tortious interference with a prospective economic advantage requires a showing that (1) the plaintiff had "a reasonable expectation of economic advantage from a prospective contractual or economic relationship; (2) the defendant intentionally and maliciously interfered with the relationship; (3) the interference caused the loss of the expected advantage; and (4) actual damages resulted." *New Skies Satellites, B.V. v. Home2US Comms., Inc.*, 9 F. Supp. 3d 459, 472 (D.N.J. 2014) (citations omitted).  "[A] plaintiff must do more than assert that it lost business.  Rather it 'must allege facts that show an existing or prospective economic or contractual relationship' for a 'mere allegation of lost business does not suffice.'"  *Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 358 (D.N.J. 2019) (citations omitted).  Defendants argue that Klapper fails to satisfy the first element of this claim.  (ECF No. 106-1 at 49.)

The Court agrees with Defendants.  "[I]t is 'fundamental' to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship."  *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37-38 (N.J. 1989) (collecting cases).  Common-law tortious interference developed to

protect parties to an existing or prospective contractual relationship from outside interference.  *Id.* at 38.  While New Jersey courts have recognized "a reasonable expectation of economic gain in as slight an interest as prospective public sales," where a party interferes with the performance of his or her own contract, the liability is governed by principals of contract law.  *Id.*

Here, Klapper claims that as a result of Defendants' conduct, he "was unable to make use of approximately $1.8 million of his money, resulting in loss of investment returns for Klapper" and that absent Defendants' "wrongful interference . . . Klapper would have continued to benefit from the use of his money."  (ECF No. 1 ¶ 124.)  Klapper's claim fails as a matter of law because he has not alleged or set forth any facts identifying prospective economic gain with a third party, nor that Klapper failed to benefit from any such prospective advantage as a result of Defendants' actions.  *See Printing Mart-Morristown*, 563 A.2d at 37-38.  Klapper claims that he is "unable to make use of" his money, but does not identify a third party or another investment opportunity in which he was unable to invest.  (ECF No. 1 ¶ 124.)  Instead, Klapper's claim for tortious interference relates entirely to his business dealings with Defendants.  (*See id.*; ECF No. 110 at 44-45.)  Such allegations do not rise to an interference with a prospective economic advantage, but rather lie in such claims as the breach of contract and breach of fiduciary duty claims that Klapper has already asserted against Defendants.  *Printing Mart-Morristown*, 563 A.2d at 37-38.  Accordingly, summary judgment is granted in favor of Defendants as to Count Seven of the Complaint.

### B.     Defendants' Counterclaims

The only Counterclaims remaining before the Court are Counterclaims One, Four, Six, Eight, and Nine.  (*See* ECF No. 73 at 2-3.)  Klapper moves for summary judgment on all of Defendants' remaining Counterclaims.  (*See* ECF No. 104-1 at 45.)  Sullivan moves for summary

judgment on Counterclaim Six.  (ECF No. 106-1 at 50.)

### 1.  *Counterclaim One – Breach of the 2008 Fee Agreement (Metus v. Klapper)*

The Court first addresses Klapper's Motion for Summary Judgment on Metus's Counterclaim One — Breach of the 2008 Fee Agreement.  Metus alleges that Klapper failed to pay Metus's management fees that had accrued in 2008 pursuant to the IMA.  (ECF No. 46 ¶ 81.)  Klapper claims that he paid the 2008 fees in full.  (ECF No. 104-1 at 31.)  Metus denies that Klapper paid the fees and challenges the veracity of the documents on which Klapper relies to support his argument.  (ECF No. 109 at 18-21.)  Therefore, there is a genuine issue of material fact as to whether Klapper paid the 2008 fees.

Metus further claims that Klapper agreed to delay payment of the 2008 fees for ten years so that Sullivan and Klapper could "invest in property in southern France" and that the parties agreed to this by way of a "letter agreement."  (*Id.* at 19.)  In support, Metus cites a letter dated September 20, 2010 (*id.*), which appears to be signed by both parties and in which Klapper agrees to fund "the French villa investment with compounded monies from the 2008 fees."  (ECF No. 104-85.)

While Klapper denies ever signing the letter.  (ECF No. 104-1 at 33 n.14.)  But he argues that even if he had executed this agreement — viewing the evidence in the light most favorable to Sullivan as the nonmoving party — the agreement would be void as a matter of law because it called for the improper commingling of funds.  (*Id.* at 49; ECF No. 119 at 68-70.)  In support of this argument, Klapper cites Section 206(4) of the Advisers Act and Rule 206(4)-2(a) promulgated thereunder, which requires investment advisers who have custody of client funds to deposit them into one or more bank accounts containing only client funds.  (ECF No. 104-1 at 47.)  Klapper also cites *SEC v. Slocum, Gordon & Co.*, in which the District Court of Rhode Island held that an

investment firm's practice of routing both firm assets and client assets through the same accounts constituted prohibited commingling of client and firm funds under the Investment Advisors Act. 334 F. Supp. 2d 144, 177 (D.R.I. 2004). (*Id.*)

In *Slocum*, the court held that the defendants violated Rule 206(4)-2(a)(2) because the exhibits at trial showed that cash flowed from both the client accounts at Merrill Lynch and the firm's line of credit at Sovereign through the Fleet clearing account and into the same custodial account, and vice versa. 334 F. Supp. 2d at 178. The court held that the Rule was intended to prevent investment advisers from commingling firm and client assets in any fashion, even if the funds are merely "routed" through an account. *Id.* The court noted that the Advisers Act was established to eliminate abuses in the securities industry, ensuring that the highest ethical standards prevailed, and that sound management of investment could not be achieved unless all conflicts of interest between the investment counsel and the client were removed. *Id.* Therefore, the court concluded that the defendants violated the rule because the commingling of funds created a prohibited conflict of interest, regardless of whether the funds were in the accounts for a short period of time or an extended period. *Id.*

It is well recognized that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers. *Belmont v. MB Investment Partners, Inc.*, 708 F.3d 470, 501 (3d Cir. 2013). The duty comprises a duty of care and a duty of loyalty. *See Commission Interpretation Regarding Standard of Conduct for Investment Advisors*, 17 C.F.R. Part 276, 2019 WL 3779889 (June 5, 2019). This duty means that the adviser must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. *Id.* at *3. In other words, the investment advisor cannot place its own interests ahead of the interests of its client. *Id.* This combination of care and loyalty obligations has been characterized as requiring the

investment adviser to act in the "best interest" of its client at all times.  *Id.*  The duty of care requires

an investment adviser to provide investment advice in the best interest of its client, based on the

client's objectives.  *Id.*  Under the "best interest" test, an adviser may benefit from a transaction

recommended to a client if, and only if, that benefit and all related details of the transaction are

fully disclosed.  *Belmont*, 708 F.3d at 501 (citation omitted).

Here, based on the record before the Court, it is not clear whether there was a true

commingling of funds, in a technical sense, as found in *Slocum*.  There is no evidence of funds

being routed or deposited between accounts.  At his deposition, Sullivan testified that his money

would be invested alongside Klapper's money and, for example, if the amount of fees that Klapper

allegedly owed at the time (about $173,000) grew to $500,000 over ten years, then the $500,000

would be owed to Sullivan.  (ECF No. 104-6 at 32-4.)  Sullivan testified that under the September

2010 letter agreement, the $173,000 would be commingled with Klapper's funds and then

separated in 2019.  (ECF No. 104-6 at 34-36.)

But even if the Court were to find an improper commingling of funds, the 2010 letter

agreement would not be void *ab initio* if Sullivan properly disclosed the conflict of interest and

was acting in the best interest of Klapper.  *See Belmont*, 708 F.3d at 501.  The parties, in their

papers, did not address whether the 2010 letter agreement satisfied the "best interest" test.  To

satisfy this test, Sullivan must have had a reasonable belief that he was acting in the best interest

of his client based on Klapper's objectives and that he made a full and fair disclosure to Klapper

of all material facts and any potential conflicts.  *See id.* at 501, 503.

Sullivan testified that the benefit Klapper would receive from this arrangement was that

Klapper would know Sullivan's interests were aligned directly with Klapper's.  (ECF No. 104-6

at 35.)  The 2010 letter agreement also disclosed that Klapper would be funding the French villa

investment with compounded monies from the 2008 fees, that Klapper and Sullivan would "share in any revenues derived from the rental of said property 50/50," and that "ownership shall be exclusive to an LLC controlled and owned by [Sullivan]."  (ECF No. 104-85.)  There is no indication that Sullivan failed to disclose additional material facts about the agreement or any additional conflicts.

Therefore, based on the record before the Court, the Court cannot find as a matter of law that the September 2010 letter agreement is void *ab initio* as illegal, and denies Klapper's Motion for Summary Judgment as to Counterclaim One on this basis.  A jury should determine whether the 2008 fees were actually paid as alleged by Klapper; whether the parties in fact entered into the purported letter agreement in 2010; whether Sullivan reasonably believed he was acting in Klapper's best interest; and whether Sullivan fully and fairly disclosed all material facts and potential conflicts of interest.

### 2. Counterclaim Four – Breach of Standstill Agreement (Sullivan v. Klapper)[8]

Klapper next moves for summary judgment on Counterclaim Four, arguing that Sullivan has not provided any evidence that Klapper breached any obligations under the Standstill Agreement.  (*See* ECF No. 104-1 at 49-51.)

On May 31, 2017, Klapper and Defendants entered into a Standstill Agreement involving TPH, pursuant to which the parties would maintain the status quo as to the state court action involving the property; Sullivan would vacate the property; and Klapper would "use commercially reasonable efforts to sell the Property on behalf of TPH."  (ECF No. 104-65 at 4-5.)

The Standstill Agreement specifically provided that if a sale occurred that "nets any sum

---

[8]      The Court previously dismissed Metus's cause of action under Counterclaim Four.  (ECF No. 73 at 2.)

above the aggregate of that which is (a) owed on any mortgages, outstanding taxes, and other liens, and (b) any other liabilities of TPH acknowledged and approved by Klapper, *the entirety of such excess funds will be distributed to Klapper alone* and Sullivan shall receive a set-off of 175% of the sum distributed to Klapper against the damages awarded, if any," in the state court litigation. (*Id.* at 5 (emphasis added).)

In June 2017, the listing agreement for the property was reduced to $3.95 million.  (ECF No. 104-2 ¶ 163; ECF No. 104-69.)  In September 2017, a prospective buyer offered $2.3 million for the TPH lot.  (ECF No. 104-2 ¶ 166.)  Klapper directed the listing agent to make a counteroffer of $3.7 million and the buyer responded with a "best and final" offer of $2.5 million.  (ECF No. 104-2 ¶¶ 168-69.)  Klapper did not accept the offer because it would have been a total loss for TPH.  (*Id.* ¶ 170.)  The property was sold at a sheriff's sale in October 2017 to PLP.  (*Id.* ¶¶ 171-173.)

Sullivan alleges that Klapper breached the Standstill Agreement by failing to use commercially reasonable efforts to sell the TPH Property — for example, by negotiating a buyout of Willing at a discount, such that there would have been a resulting profit on a resale of the property.  (ECF No. 109 at 32.)  Sullivan further claims that a mold issue was allowed to develop under Klapper's watch which significantly damaged the value and marketability of the property. (*Id.*)  In support of his argument, Sullivan cites the deposition testimony of Paul Zelenty, the attorney Klapper hired when he took over TPH.  Zelenty testified that he was not aware of a mold problem at the time Klapper took over TPH in June 2017.  (ECF No. 109-2 ¶¶ 62-66.)  Sullivan also relies on a February 2018 mold report that indicated that there were no dehumidifiers, which Sullivan understands to mean that someone removed them from the property.  (ECF No. 109-6 at 4.)  Sullivan admitted that he had no first-hand evidence that the dehumidifiers were not present

22

in the basement other than the mold report.  (*Id.*)  However, Zelenty testified that he would turn off the dehumidifiers when he was not at the property.  (ECF No. 109-2 ¶ 64.)  Willing also testified that he didn't specifically know there was mold, but it was obviously very wet and damp, and it had been for some time.  (ECF No. 109-11 at 3.)

Klapper disputes Sullivan's allegations.  First, Klapper asserts that the record shows that during the "incredibly brief" Standstill Period of May 31 to July 31, 2017, he made commercially reasonable efforts "to sell a property that Sullivan had been unsuccessful in selling for years." (ECF No. 104-1 at 50.)  These efforts include reducing the asking price and attempting to negotiate upon receiving Sean Griffith's offer.  (*Id.*)  Klapper further argues that he could not have negotiated a buyout with Willing or PLP.  (ECF No. 114 at 16.)  In September 2017, at the time when Sean Griffith offered $2.5 million, PLP did not own the property, and over $2.9 million was owed to PLP due to Sullivan's default on the PLP mortgage.  (*Id.*)  Further, Klapper claims that he engaged in extensive negotiations with PLP, but PLP was not willing to compromise the debt for less than $2.6 million.  (*Id.* at 17 n.10.)  Sean Griffith's offer still would have been $100,000 shy of eliminating the debt to PLP even if PLP had agreed to compromise at $2.6 million — and Klapper would still have lost his $1 million investment.  (*Id.*)

Regarding the allegations of mold, Klapper argues that Sullivan cannot support his claims that Klapper allowed TPH to fall into disrepair and develop a significant mold problem as Klapper alleges Sullivan did not visit the property during the Standstill Period.  (*Id.* at 17.)  Sullivan's allegations are based on a February 2018 report, which Klapper claims is inadmissible hearsay (as Sullivan cannot verify the allegations in the report).  (ECF No. 104-1 at 51.)  Moreover, Klapper argues that Sullivan has not proffered an expert opinion suggesting the mold was exacerbated on Klapper's watch.  (*Id.*)

Turning first to Klapper's argument that the February 2018 Mold Report is inadmissible hearsay, Rule 56(c)(1)(B) states: "a party asserting that a fact . . . is genuinely disputed must support the assertion by . . . showing . . . that an adverse party cannot produce admissible evidence to support the fact."

> [T]he rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial. In ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial. The proponent need only explain the admissible form that is anticipated. Thus, in ruling on Defendants' motion for summary judgment, the district court should have limited its inquiry to determining if the out-of-court statements Plaintiffs were relying on were admissible at trial.
>
> [*Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238-39 (3d Cir. 2016) (internal citations and quotations omitted).]

Federal Rule of Evidence 801(c) proscribes hearsay from being admitted into evidence, which is defined as an out-of-court statement being offered for the truth of the matter asserted. Fed. R. Evid. 801(c)(2). Sullivan does not proffer that an admissible form of the Mold Report is anticipated.[9] *See Fraternal Ord. of Police, Lodge 1*, 842 F.3d at 238-39. Thus, Sullivan cannot defeat summary judgment on Counterclaim Four.

In addition, summary judgment "cannot be avoided by resorting to speculation, or statements of personal opinion or mere belief; [an] 'inference based on speculation or conjecture does not create a material factual dispute.'" *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 527 (D.N.J. 2013), *aff'd* 649 F. App'x 239 (3d Cir. 2016) (quoting *Robertson v. Allied Signal,*

---

[9]     Upon the Court's review of the entire record, the Court has not found a copy of the February 2018 Mold Report. If the report appears in the motions' supporting exhibits, it was incumbent on the parties to bring the report to the Court's attention. *See DeShields v. Int'l Resort Properties Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) ("[J]udges are not like pigs, hunting for truffles buried in briefs." (internal quotation omitted)).

*Inc.*, 914 F.2d 360, 382 n.12 (3d Cir.1990)); *see also Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir.2002) (noting that a party opposing summary judgment must rely on facts, not "opinions or conclusions"); *Rakowski v. Brigantine*, Civ. No. 19-21847, 2022 WL 326992, at *1 (D.N.J. Feb. 3, 2022) ("[M]ere allegations, conclusions, conjecture, and speculation will not defeat summary judgment.").

Here, Sullivan fails to proffer evidence, other than his own speculation, that Klapper caused the property to fall into disrepair due to mold, as Sullivan did not have any firsthand observation of the mold during the during the Standstill Period. (ECF No. 109-6 at 4.) This mere speculation is not enough to defeat Klapper's Motion for Summary Judgment.

Klapper argues in the alternative that even if the mold existed during his watch, Sullivan cannot proffer any evidence that the issue hindered the sale of the property or reduced its market value. (ECF No. 114 at 17.) Conversely, Sullivan alleges that had the mold issue not been present, the property would have likely sold for $2.9 million. (ECF No. 109-12 at 8.).

To defeat a motion for summary judgment on a breach of contract claim, the claimant must establish that the alleged damages were a "reasonably certain" consequence of the breach. *Marino v. Brighton Gardens of Mountainside*, Civ. No. 20-7142, 2023 WL 6366013, at *9 (D.N.J. Sept. 29, 2023) (denying summary judgment because the plaintiff proffered evidence showing that it was reasonably certain that the plaintiff had suffered damages).

Here, the only plausible way Sullivan would have received a set-off under the Standstill Agreement is if the property had sold for $3.9 million, given that PLP was owed $2.9 million on the PLP Mortgage and Klapper was entitled to recoup the first $1 million under the Operating Agreement. (ECF No. 104-66 § 4.2.) Sullivan alleges that had the mold issue not been present, the property would have likely sold for $2.9 million. (ECF No. 109-12 at 7-8.) Additionally,

Willing testified that the reduction in price also reflected other issues such as cracks in the foundation, work that needed to be done on the deck, and major HVAC issues.  (ECF No. 114-5 at 4.)  No evidence in the record exists to indicate that it was "reasonably certain" that the property would have sold for $3.9 million or more, and that Sullivan would have received a set-off.  For these reasons, even viewing the evidence in a light most favorable to Sullivan, Sullivan is unable to show that damages were a "reasonably certain" consequence even if Klapper had breached the Standstill Agreement.  Accordingly, Klapper is entitled to summary judgment on Counterclaim Four.

### 3. Counterclaim Six – Breach of Operating Agreement (Sullivan v. Klapper)

Both Klapper and Sullivan move for summary judgment on Counterclaim Six for Klapper's alleged breach of the Operating Agreement.[10]  Klapper claims Sullivan cannot demonstrate that Klapper is liable for any alleged breach of the Operating Agreement because the Operating Agreement limits Klapper's liability to the TPH and Sullivan to instances in which Klapper acted in bad faith.  (ECF No. 104-2 ¶ 154; ECF No. 104-66 § 2.4.)  Sullivan asserts that Klapper breached the Operating Agreement and acted in bad faith because Klapper failed to properly manage and operate TPH, made no effort to sell the property, and dissolved TPH without Sullivan's consent.  (ECF No. 46 ¶¶ 110-112.)  Sullivan alleges that the dissolution was outside the scope of authority granted to Klapper by the Operating Agreement.  (*Id.* ¶ 113.)

First, the Court denies summary judgment for Sullivan on the allegations that Klapper failed to properly manage TPH and to make reasonable efforts to sell the property for the same reasons discussed previously regarding the Standstill Agreement.  In addition, the Court finds that

---

[10]    The Operating Agreement was the agreement between Plaintiff and Defendants giving Plaintiff day-to-day control over the operations of TPH, with the intent to avoid the foreclosure of the TPH property.  (ECF No. 104-2 ¶¶ 150-151.)

the Operating Agreement states that Klapper's liability to TPH or to Sullivan is limited to instances of bad faith.  (ECF No. 104-66 § 2.4.)  Thus, on Sullivan's Motion for Summary Judgment on Counterclaim Six, the two questions before the Court are (1) whether Klapper breached the Operating Agreement by dissolving TPH without Sullivan's consent, and (2) if so, whether he acted in bad faith.  Klapper contends, and Sullivan does not dispute, that Klapper attempted to notify Sullivan in advance that TPH would be dissolved by sending a letter to Sullivan in Germany. (*See* ECF No. 110 at 45-46; ECF No. 106-1 at 28-29.)  Sullivan, however, argues that the letter contained an "incomplete and/or inaccurate street address" and was never received by Sullivan. (ECF No. 106-1 at 28-29.)  Klapper argues that the address was abbreviated properly, and was an address to which Sullivan had previously requested the parties send correspondence.  (ECF No. 110-1 ¶ 114.)  The Court finds that the record raises questions of fact that are inappropriate to decide at summary judgment.  Summary judgment in favor of Sullivan on Counterclaim Six is denied.

Klapper, however, argues that summary judgment in his favor is proper as a matter of law because Sullivan cannot show any damage flowing from Klapper's alleged breach of the Operating Agreement, an essential element for a breach of contract claim.  (ECF No. 104-1 at 52-53.)

When asked at his deposition what harm he suffered through the dissolution of the LLC without his consent, Sullivan suggested that "the dissolution of the LLC may affect the other court case against the town of Atlantic Highlands," but that he would have to "defer to Counsel."  (ECF No. 104-6 at 24.)  Later, Sullivan argued that as a result of the TPH dissolution, he was damaged because "Sullivan lost his membership interest in TPH, and therefore any rights that TPH had, including, but not limited to, its lawsuit against the Borough."  (ECF No. 109 at 30.)  Klapper argues that Sullivan did not suffer any damages through the alleged breach of the Operating

Agreement because at the time of the dissolution, Lot 8.01 (TPH's only asset) had already been sold two years prior in a sheriff's sale.  (ECF No. 104-1 at 53-54.)  Moreover, Klapper further argues that the dissolution of TPH did not strip away Sullivan's right to bring a lawsuit against Atlantic Highlands.  (ECF No. 114 at 18.)  Indeed, the dissolution occurred on July 31, 2019 (ECF No. 104-2 ¶¶ 176-177), and Sullivan subsequently filed a lawsuit against Atlantic Highlands and other parties on October 29, 2019.  *See Sullivan v. Borough of Atlantic Highlands*, Civ. No. 19-19510, 2022 WL 980684, at *2 (D.N.J. Mar. 31, 2022).  (*See also* Civ No. 19-19510, ECF No. 1 at 19 (showing that the Complaint in that case was filed on October 29, 2019).)  Notably, the court in that related case found that as of January 30, 2017 — the date a New Jersey state court permanently enjoined Sullivan from operating TPH as anything other than a single-family private residence — "there could be no reasonable expectation of economic gain" in the TPH.  *Sullivan*, 2022 WL 980684, at *4-5.  Therefore, at the time Klapper dissolved TPH, Sullivan lacked any reasonable expectation of economic gain in TPH, and PLP's only asset had already been sold.  As a result, Sullivan cannot establish as a matter of law that he suffered any damages even if Klapper had breached the Operating Agreement.  Accordingly, the Court grants summary judgment in Klapper's favor on Counterclaim Six.

### 4. *Counterclaim Eight – Nullification of Dissolution and Termination of TPH (Sullivan v. Klapper)*

Klapper also moves for summary judgment on Counterclaim Eight, and Sullivan concedes that Klapper is entitled to Summary Judgment on Count Eight.  (ECF No. 109 at 7 n.1.)  Pursuant to Sullivan's stipulation, the Court enters summary judgment in favor of Klapper on Count Eight.

### 5. *Counterclaim Nine – Breach of Fiduciary Duty (Sullivan v. Klapper)*

Finally, Klapper argues that Counterclaim Nine for a breach of fiduciary duty should be

dismissed.[11]  A member-manager of a member-managed LLC owes fiduciary duties to the LLC

and to the other members.  *See* N.J. Stat. Ann. § 42:2C-39(a).  In other words, following the parties'

effectuation of the Operating Agreement which made Klapper the manager of the TPH LLC,

Klapper owed Sullivan a fiduciary duty.  But "[t]here is no valid claim for breach of fiduciary duty

based on members in a member-managed company acting in conformity with the provisions

clearly set forth in [an] Agreement."  *Namerow v. PediatriCare Assocs., LLC*, 218 A.3d 839, 847

(N.J. Super. Ct. Ch. Div. 2018).

The Court has already found that Klapper did not breach the Standstill Agreement, so a

breach of fiduciary duty premised on the Standstill Agreement cannot stand.  And although the

Court has not determined whether the Operating Agreement was breached, the Court has found

that Sullivan is unable to establish as a matter of law that he could have suffered any damages even

if Klapper breached the Operating Agreement.

Under New Jersey law,[12] to state a claim for breach of fiduciary duty, a party must show

that "(1) a fiduciary duty existed between Plaintiff and Defendant, (2) the defendant breached that

duty, and (3) damages as a result of the breach."  *Jeffrey Rapaport M.D., P.A. v. Robin S. Weingast*

*& Assocs., Inc.*, 859 F. Supp. 2d 706, 717 (D.N.J. 2012) (citing *F.G. v. MacDonell*, 696 A.2d 697

(N.J. 1997)).  Because Sullivan did not suffer any damages through a breach of either the Standstill

Agreement or Operating Agreement, summary judgement must be granted in Klapper's favor.  *See*

*Sery v. Fed. Bus. Centers, Inc.*, Civ. No. 06-1026, 2008 WL 1776551, at *7 (D.N.J. Apr. 16, 2008),

---

[11]     As an aside, Defendants assert that they are no longer pursuing the portion of Counterclaim
Nine for breach of fiduciary duty based on Plaintiff's failure to provide Defendant Sullivan with
Form K-1s.  (ECF No. 109 at 7 n.1.)

[12]     Based on the text of the Standstill and Operating Agreements, New Jersey law governs
both agreements.  (*See* ECF Nos. 104-65, 104-66.)

*aff'd*, 365 F. App'x 396 (3d Cir. 2010) (granting summary judgment and dismissing breach of fiduciary duty claim because the party did not suffer damages resulting from the alleged breach). Therefore, the Court grants Klapper's Motion for Summary Judgment as to Counterclaim Nine.

IV.    **CONCLUSION**

For the foregoing reasons, and other good cause shown, the Court **GRANTS** in part and **DENIES** in part the Motions for Summary Judgment filed by Klapper and Defendants (ECF Nos. 104 & 106).  An appropriate Order follows.

Dated: April 16, 2024

**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**